IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

QWEST CORPORATION,

    Plaintiff,

v.                                                                              CIV 10-0617 RB/KBM

CITY OF SANTA FE,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Motion to Compel and For Sanctions *(Doc. 142)* filed by Defendant City of Santa Fe ("City"). Having reviewed the parties' submissions and relevant authorities, I find Defendant's Motion is well-taken in part and will be granted in part.

**A.    Interrogatory No. 3 and Request for Production Nos. 1 and 15**

Defendant raises multiple issues with Plaintiff's responses to these discovery requests seeking information as to "wholesale providers." Interrogatory 3 states:

> For the period of 1975 through 2010, identify each and every wireless or wireline telecommunication carrier, cable television provider, internet access provider or other entity that Qwest has sold any kind of service to or charged any amounts to for using Qwest's facilities in the public rights-of-ways within the City, and/or that has in any other way used or occupied property owned or managed by Qwest and, for each such provider, identify each such entity, any agreements between Qwest and such entity, and the revenues Qwest received from each such entity each month.

*Doc. 142-1* at 2. Requests for Production Nos. 1 and 15 sought all documents relating to its interrogatories. *Id.* at 6-7. After Qwest objected on the grounds that the request was overly broad and unduly burdensome, the City reduced the time period to 15 years (1995-2010) in an

attempt to compromise, and I adopted that time frame for discovery. *Doc. 142* at 6.

After significant delay, Qwest produced two charts listing wholesale customers from 2002 through the first part of 2011. *Doc. 145* at 2. The City was initially unsure whether Qwest's response was complete because Qwest disclosed 85 wholesale customers, yet it reported that there are 139 agreements with wholesale customers in place. *See Doc. 148* at 3. The City indicates that Qwest "has explained in its Surreply the reasons for the apparent discrepancy." *Doc. 163* at n.1.[1]

Qwest's charts "identify wholesale customers that leased facilities or circuits from Qwest in the years 2002-2010 and the first part of 2011 in the Santa Fe wire centers. (2002 is the earliest year Qwest had revenue data for these wholesale products.)." *Doc. 145* at 2. The City argues that Qwest has improperly restricted its response to only those wholesale customers who have **leased**, as opposed to otherwise acquired, facilities or circuits from Qwest. *Doc. 48* at 3. The City complains that Qwest has further limited the 15-year time frame for discovery which was ordered by the Court. *Id.* In addition, Qwest has yet to produce any of its underlying agreements with wholesale customers.

I find that these discovery requests seek information that is well within the scope of discovery. I agree with Defendant that the requested information "is relevant to the City's counterclaim and allegations that Plaintiff 'has excluded receipts from 'features' and from other services Qwest provides over facilities located in the City's rights of way which are a part of

---

[1] "The 139 agreements identified by Qwest are the total number of active interconnection agreements in the state. The total number of responsive wholesale customers included in Qwest's production is less because less than all of the wholesale contracting parties leased services during the identified period (since 2002)." *Doc. 157* at n.3.

West's 'gross receipts' and against which Qwest is obligated to pay the City a percentage.'" *Doc. 142* at 12 (quoting *Doc. 98* at 13). As Qwest points out, the underlying agreements do not reflect amounts actually paid or received by Qwest for wholesale services. However, they do "contain terms of service and rate sheets for the applicable charges." (*Doc. 145* at 2.) Thus, contrary to Qwest's assertions, the agreements are not "irrelevant to the calculations of wholesale revenues." *Id.*

Qwest maintains that the burden in identifying and producing the agreements far outweighs the "minimal" relevance of the information. No doubt it will require a great deal of effort for Qwest to produce the agreements. *See Doc. 145* at 2-5. And, Qwest contends that the City can obtain the information itself – "the combination of the PRC and Qwest websites is sufficient for the limited relevance of these documents," *id.* at 4. But Qwest is unwilling to verify the accuracy of the PRC database. *Doc. 148* at 5. Moreover, a member of my chambers staff has attempted to access the underlying agreements via the PRC website. While we have located at least 212 potentially responsive documents, we are at a loss to see how anyone but Qwest or the individual wholesale customers could determine which of these documents are responsive.

I therefore find that Qwest must: (1) certify in writing that it is has no information responsive to Interrogatory No. 3 prior to 2002; (2) certify in writing that it has identified all entities that have used or occupied property owned or managed by Qwest in the public rights-of-way within the City along with the corresponding revenues or, alternatively, identify any previously undisclosed entities and corresponding revenues; and (3) identify and produce all requested agreements between such entities and Qwest.

3

B.     Interrogatory Nos. 4, 2-1, 2-3, 2-4, and 2-5

Here, Defendant seeks the underlying data from which Qwest calculated its prior franchise fee payments. I previously ordered Qwest to either produce certain information or certify under penalty of perjury that no such information exists. *Doc. 133*. First, Qwest was to produce "the USOC codes comprising the franchise fees Qwest paid the City for the years 1999 and 2000." *Id.* Second, Qwest was ordered to map the USOC codes to tax identification numbers that went into effect in 2001. *See id.* It is Defendant's position that Qwest has not met obligation with regard to either category.

*1. USOC Codes Comprising Franchise Fees Paid the City for the years 1999 and 2000*

According to Qwest, it has produced all responsive information in response to this request and Court Order. *See Doc. 142-24*. Namely, Qwest states that "USOCs were mapped to journal codes for revenue accounting and tax computation purposes, and the journal codes, in turn, were mapped to main accounts and sub-accounts." *Id.* While Qwest has produced the journal codes and the main accounts and sub-accounts to which they were mapped, QWEST0005362-5626, Qwest did not maintain "information that would identify **with certainty** the USOCs that were mapped to the journal codes and that were used for calculating the franchise fee paid to the City before 2001." *Id.* (emphasis added).

Nothing before me suggests that the USOCs used for calculating the franchise fee before 2001 are actually different from the USOCs used for calculating the franchise fee after 2001. Since there is no dispute that Qwest has produced the USOCs used to calculate the franchise fee after 2001, it appears that Defendant could proceed with its calculations (or recreations of Qwest's calculations) using the known USOCs. Alternatively, Qwest's former tax research

manager indicates that Defendant could use the USOCs mapped to the "pound sign," which are available, "as exemplary of the USOCs underlying the journal codes that were used for calculating the franchise fee for Santa Fe." *Doc. 145-2* at 5.

It is my understanding that Qwest faces the same difficulties as the City in recreating the 1999-2000 franchise fee calculations.  If future discovery or other proceedings reveal that Qwest withheld information or data relevant to 1999-2000 franchise fee calculations, I will consider whether to impose sanctions, including but not limited to urging preclusion of newly-discovered material.

    *2. Mapping of USOC codes to tax identification numbers that went into effect in 2001*

Initially, I am not convinced that the City meant to take issue with this aspect of Qwest's discovery responses.  Defendant's Motion addresses pre-2001 responses, but does not specifically address the sufficiency of the mapping.  *See Doc. 142*.  Perhaps Qwest noticed something that I did not because Qwest's Response addresses the mapping, with Qwest arguing that it "does not know on what basis the City can assert in its Motion to Compel that Qwest has failed to provide this information." (*Doc. 145* at 11.)  In Reply, the City complains only that Qwest "failed to identify which USOCs or elements thereof comprise the revenues used to determine franchise fees due to the City." (*Doc. 148* at 9.)  While this may be true, the mapping of USOCs to tax identification numbers is only necessary and/or useful because Qwest is not able to identify USOCs comprising revenues used to determine franchise fees prior to 2010.  The mapping exercise was designed to help recreate the calculation of franchise fees even though Qwest is unable to identify the USOCs.  Because there is no identified deficiency with the mapping, there is nothing to compel, and I cannot find that Qwest has failed to meet its discovery

5

obligations.

**C.     Interrogatory No. 2-12**

There is nothing unique about Defendant's Interrogatory No. 2-12.  It asks Plaintiff to isolate, out of a banker's box of documents produced by Qwest, those documents that support certain opinions expressed by Plaintiff's expert, William Fitzsimmons.  *Doc. 119-1 at 13-14*.  After twice failing to adequately respond, Plaintiff agreed to a compromise offered by Defendant requiring Dr. Fitzsimmons to specifically acknowledge that he "did not actively consult any of the documents produced" when preparing his initial declaration.  *Doc. 119-1 at 13-14; Doc. 119-3 at 5-6; Doc. 119-5 at 2*.

When Plaintiff failed to live up to this discovery obligation a third time, I entered an order requiring Plaintiff to make the response as it had agreed it would do.  *See Doc. 125* ("Qwest shall provide Dr. Fitzsimmons' Supplemental Report including the specific language that he 'did not actively consult any of the [Bates Numbered documents referenced in Qwest's October 3, 2011 letter] in formulating his declaration and Initial Report' and providing the underlying calculation for the four dollar figures cited on Page 7 (lines 25 and 26) of his Initial Report, including an attachment containing supporting documents and necessary explanations.").  Instead, "Dr. Fitzsimmons stated that it was this universe of documents that he would have consulted to refresh his recollection" in preparing that declaration and rejected the agreed upon language.  *See Doc. 157 at 5*.  It appears Plaintiff has again failed to live up to both its discovery obligations per agreements with counsel and ratification by the Court.  *See Doc. 142-23*.

Given Plaintiff's failure to comply with its agreement as reflected in my Order (*Doc. 125*), I find that Plaintiff must respond fully to Defendant's original Interrogatory No. 2-12.

Regardless whether the subject documents have been previously produced, Plaintiff (together with Dr. Fitzsimmons) must produce and separately identify any and all documentation supporting Dr. Fitzsimmons' declarations as set out in Defendant's Interrogatory No. 2-12.  In the event that Plaintiff is not able to identify or produce any such documents, it must certify in writing that Dr. Fitzsimmons states that he is unable to pinpoint specific documents in support of his statements.  Plaintiff shall provide its response no later than February 29, 2012.

Moreover, as a sanction for Plaintiff's failure to abide by its discovery obligations, including the Order of the Court (*Doc. 125*), Defendant shall be awarded its fees and expenses incurred in bringing an pursuing the instant motion to compel.  To the extent that Plaintiff again fails to comply, I will consider whether to recommend to the presiding judge that Dr. Fitzsimmons not be permitted to testify in this matter.  The Court will also entertain a request, if any, by the City to depose Dr. Fitzsimmons.

Wherefore**,**

**IT IS ORDERED** that Defendant the City of Santa Fe's Motion (*Doc. 142*) is **granted in part.**  Qwest is therefore ordered to perform as follows, by no later than February 29, 2012:

1.  certify in writing that it has no information prior to 2002 that is responsive to Interrogatory No. 13 and Request for Production Nos. 1 and 15;

2.  certify in writing that it has identified all entities (and corresponding revenues) that have used or occupied property owned or managed by Qwest in the public rights-of-way within the City or, alternatively, identify any entities and corresponding revenues that were not previously disclosed;

3.  identify and produce the agreements between Qwest and the entities that have used or

occupied property owned or managed by Qwest in the public rights-of-way within the City;

    4.  respond fully to Defendant's Interrogatory No. 2-12, including but not limited to producing and separately identifying all documents supporting Dr. Fitzsimmons' declarations as set out in Interrogatory No. 2-12.  Alternatively, Qwest may certify in writing that Dr. Fitzsimmons is unable to pinpoint specific documents in support of his statements, as set forth in Interrogatory No. 2-12;

    5. Qwest is further ordered to pay the City's attorney fees and expenses incurred in pursuing the instant motion to compel;

    6. In all other respects, the motion is denied.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE