IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

QWEST CORPORATION,

       Plaintiff/Counter-Defendant,

v.                                  CIV 10-0617 RB/KBM

CITY OF SANTA FE, a New Mexico
Municipal corporation,

       Defendant/Counter-Plaintiff.

# MEMORANDUM OPINION AND ORDER
# ON DEFENDANT'S SECOND MOTION TO COMPEL

THIS MATTER comes before the Court on Defendant City of Santa Fe's Second Motion to Compel and for Sanctions *(Doc. 161)*, filed February 8, 2012 and fully briefed on March 20, 2012. *See* City's Motion and Memorandum in Support *(Doc. 161)*, Qwest's Response in Opposition *(Doc. 169)* and City's Reply Brief *(Doc. 178)*. Having reviewed the motion as well as the memoranda and exhibits submitted by the parties, I find the Motion is well-taken in part. I have also considered Qwest's request for oral argument, but I find that it is unnecessary to my decision.

## I.      BACKGROUND

This litigation arises from the decision by the Defendant City of Santa Fe ("the City") to increase its franchise fees and charges for permits that Qwest must obtain to install its facilities in the public rights-of-way. *See generally Doc. 95.* Qwest contends the City's contemplated fee increases violate the United States Constitution and federal laws. *See id.* The latest discovery dispute in this matter concerns Qwest's answers to the City's third set of discovery requests. *See*

*Doc. 161*.

## II.   ANALYSIS

### A.   The City's Motion to Compel is Timely

Although it served its answers and written responses to the City's third set of discovery on December 27, 2011, Qwest did not deliver documents responsive to these requests until January 6, 2012, noting that it was "unable to obtain, organize, and label all of the documents" because of the holidays. *See Docs. 161-1* at 2 and *161-2*. Qwest then provided additional responsive documents on January 12, 2011, and has continued to provide responsive documents up through and including the date of its Response to the pending Motion. *See Doc. 169* at 10.

Despite its rolling production of responsive documents, Qwest took the position in negotiations with the City that the City's Motion is, at least in part, untimely. *See Doc. 161-7*. Qwest's position is incorrect. This Court's Local Rules provide that a Motion to Compel should be filed "within twenty-one (21) days of service of an objection unless the response specifies that documents will be produced or inspection allowed. In this case, the party must proceed under D.N.M.LR-Civ. 37.1 within twenty-one (21) days *after production or inspection of the documents*." D.N.M.LR-Civ. 26.6 (emphasis added). Given the delayed production of documents by Qwest, I find that the City's Motion to Compel is timely.

### B.   General Objections are Overruled and Stricken

General objections, such as those asserted by Qwest, make it impossible to identify the interrogatory or request to which the objection refers. Rule 33 requires that "[a]ll grounds for an objection to an interrogatory shall be stated with specificity." FED. R. CIV. P. 33(b)(4). Moreover, general objections are generally disfavored. *See Pulsecard, Inc. v. Discover Card*

*Servs., Inc.*, 168 F.R.D. 295, 303 (D. Kan. 1996).  Qwest's general objections therefore are overruled and stricken.

        C.      <u>Both Parties' "Background" Arguments</u>

The City and Qwest each set forth lengthy histories of the discovery disputes at issue. While I applaud the attorneys' advocacy on behalf of their respective clients, I would encourage both sides to refrain from such argument.  Discovery can be arduous, particularly in complex, technical cases like the present one.  The parties should conserve their energy – and the Court's time –  to focus primarily on working together, within the limits of the Federal Rules of Civil Procedure to (a) understand the nature of the information at issue and how it is maintained and (b) make sure that the right information is before the Court.

        D.      <u>Interrogatory No. 3-2</u>

The City asks for "detailed descriptions of the corporate structures" of Qwest, both before and after its merger with CenturyLink.  The request for information includes, but is not limited to, "organizational charts that identify all holding, parent, subsidiary, and other affiliated companies, that show the equity ownership interests in each of these companies, and that indicate the period of time that each identified company has provided services in the State of New Mexico and in the City of Santa Fe."  *See Doc. 161-1* at 5-6.

Qwest responded by producing only lists indicating affiliates, parents, and subsidiaries both before and after the merger.  *See Doc. 169* at 6; *Doc. 178* at 6.  Qwest also indicated that all subsidiaries are either wholly-owned or majority-owned by the parent corporation.  *See Doc. 169* at 6-7.  Yet, Qwest's responses are deficient in that they do not indicate lines of authority, responsibility, and reporting among the companies nor the equity ownership.  *See*

*Doc. 178* at 6.  Qwest is directed to answer the interrogatory fully.  If it does not have organizational charts explaining the relative lines of authority, responsibility, and reporting, then it is obligated to provide a sufficiently detailed description in answering Interrogatory No. 3-2

      E.      <u>Interrogatory Nos. 3-3, 3-4 and 3-5</u>

      These discovery requests relate to Qwest's construction projects and corresponding budgets within the corporate limits of the City of Santa Fe.  Interrogatory No. 3-3 seeks a detailed description of such projects active or initiated from January 1, 2009 through September 30, 2011.  *See Doc. 161-1* at 6.  Interrogatory No. 3-4 seeks final construction budgets for such projects for calendar years 2006-2011.  *See id.* at 7.  Interrogatory No. 3-5 seeks estimated budgets for anticipated projects during 2012 and 2013.  Such discovery is relevant, according to the City, given Qwest's assertions that increased franchise and permit fees would limit Qwest's investment in infrastructure and restrict its ability to provide competitive services.  *See Doc. 161* at 8.  The City points to a Qwest's employee's testifiimony in support of a preliminary injunction that the City's proposed fees would account for 14% of Qwest's budget for network investment and maintenance.  *See id.* at 8-9.

      Qwest objects to producing the requested information on the grounds that it is unduly burdensome and not likely to lead to the discovery of admissible evidence.  *See Doc. 161* at 3-4.  In particular, Qwest argues that "[h]istorical construction spend, however, is irrelevant to the issue of the future impacts of the fee increases as such increases have not taken effect."  *Doc. 169* at 8-9.  Qwest indicates that "the fees are currently designed as a pass-through to customers," such that "[t]he impact on network construction would not occur until the market impact of the fees was felt and demand was reduced."  *Id.* at 9.

4

The requested information is arguably relevant given Rachel Torrence's testimony. However, Qwest has adequately demonstrated that there is a significant burden involved in gathering the requested information. *See Doc. 169* at 9-10. I find that the burden and/or expense of the proposed discovery – in particular, the required review and analysis of each individual job – outweighs its likely benefit. *See* FED. R. CIV. P. 26(b)(2)(C)(iii). Qwest's spreadsheet constitutes a sufficient response to Interrogatory Nos. 3-3 and 3-4.

With regard to Interrogatory No. 3-5, Qwest has unequivocally stated that it has "no Santa-Fe specific construction budgets for 2012 or 2013." Should Qwest perform such estimates at any time before the close of discovery, it must supplement its discovery responses and produce them. *See* FED. R. CIV. P. 26(e). If estimates are not produced in discovery, the presiding judge will likely prohibit Qwest from introducing evidence of any estimated budgets at trial.

      F.    <u>Interrogatory No. 3-6</u>

This interrogatory seeks a detailed inventory of Qwest's telecommunications facilities within the City's public rights-of-way. *See Doc. 161-1* at 8. Because the interrogatory identifies 19 separate elements (e.g., the number of poles, the average height of poles, the average diameter of poles) to be included in the answer, Qwest objects on the grounds that it should be counted as 19 separate interrogatories, putting the City over its limit, in this case, of 50 interrogatories. *See Doc. 161-1* at 9. The Court finds that the 19 subparts, each identifying particular equipment included in the requested inventory, are part of a single line of inquiry and do not constitute discrete subparts that should be counted separately. *See* FED. R. CIV. P. 33(a) (limiting interrogatories and providing that each "discrete subpart" should be separately counted).

A key issue in this lawsuit is Qwest's contention that the City's proposed ordinance treats

5

Qwest unfairly when compared with other telecommunications carriers.  *See Doc. 95* at 11-12.

Qwest alleges that the City has not charged other telecommunications carriers the kind of

franchise fees for use of the public rights-of-way that it assesses against Qwest.  *See id.* at 11

(contending that other carriers are assessed only a "$100 one-time permit fee charged at the time

of installation").  The City characterizes Qwest's argument as a claim "that it is paying a

disproportionate share of the City's costs in maintaining its public rights-of-way."  *Doc. 161* at

11.  Clearly, the requested information concerning Qwest's telecommunications facilities is

relevant to both parties' claims and defenses in this case.

The Court is at a loss to understand how Qwest is unable to respond.  Qwest

acknowledges that the information requested is "technically" available within its OSPFM

database.  *See Doc. 169* at 13.  Qwest suggests that the City and I personally view the OSPFM

database here in Albuquerque so as to understand its complexity and technical issues in

retrieving information from it.  I am unpersuaded that a "viewing" of the database would be

beneficial, however.  In any event, it is Qwest alone that determines the manner in which its

facilities-related information is stored.  The requested information is relevant and must be

produced.

To provide the requested information, Qwest states it would have to: (1) "locate and

track each distribution area in OSPFM to determine if in the City"; and (2) locate and drive to all

facilities to determine if they are in the rights-of-way.  *Id.*  These tasks do not seem overly

burdensome, and the Court will require that they be performed.  Qwest complains that even after

taking these steps, it still might not be able to determine whether the facilities are in the rights-of-

way.  *See id.*  The Court is hopeful that the information gathered is sufficiently reliable so that

surveys will not be necessary for such determinations.  For any facilities for which a survey may be required, Qwest will identify these to the City and to the Court for a determination if any such surveys should be undertaken.

       G.     <u>Interrogatory Nos. 3-13 and 3-14 and RFP Nos. 3-13, 3-14, and 3-18</u>

This group of discovery requests seeks information relating to Qwest's decision-making process when considering a possible challenge to a governmental entity's franchise ordinance. Interrogatory No. 3-13 asks in part for all employees or representatives involved in making the decision to challenge an ordinance from 1995 to the present.  *See Doc. 161-1* at 11.  Interrogatory No. 3-14 similarly asks for all employees and/or other representatives, specifically including those within Qwest's legal department, with authority to determine whether Qwest will challenge a franchise ordinance.  *Id.* at 12.  RFP No. 3-13 seeks related policies and procedures; RFP No. 3-14 requests correspondence and other documents exchanged as part of any such challenges from 1995 to the present; and RFP No. 3-18 asks for documents that might direct Qwest employees regarding "acceptable and unacceptable terms and conditions of a governmental entity's franchise ordinance."  *See id.* at 21, 23-24.

Qwest has objected to these discovery requests on multiple grounds, including that they are overly broad, unduly burdensome, and unlikely to lead to admissible evidence.  *See id.* at 11-12, 21-22, 24.  Additionally, Qwest objects to producing documentation concerning their decision-making process with regard to the City's ordinance on the grounds of work product. *See id.*

The Court finds that Qwest need not produce information or documents concerning Qwest's challenges to ordinances of other governmental entities.  The burden or expense of

gathering and producing such information outweighs any potential benefit of the information at trial. *See* FED. R. CIV. P. 26(b)(2)(C)(iii).

The Court also agrees with Qwest that correspondence regarding its decision to challenge the City of Santa Fe's ordinance may constitute attorney work-product. In order to properly assess this, however, Qwest must complete a privilege log, identifying each document and the individuals (by name and title) who wrote and received the document. Documents not created in the process of determining whether to challenge the City's ordinance, such as policies and procedures, must be produced. Interrogatory Nos. 3-13 and 3-14 also require Qwest to list all individuals (including their job titles and whether they are still employed and/or affiliated with Qwest) who were involved in the decision to challenge the City's proposed franchise ordinance and provide a short description of their roles and duties (making any appropriate distinctions regarding the roles and/or duties of the others named). Qwest should further indicate those individuals with authority to decide whether Qwest would challenge such an ordinance.

H.     Interrogatory Nos. 3-15 and 3-16.

Here, the City seeks information regarding "TAR revenues." Qwest indicates that it uses the acronym "TAR" in two ways: (1) to connote "tax area record," which is a way of tracking the applicable taxes and surcharges to its customers within a certain geographic boundary, and (2) to connote "transfer area record," which is a form of report used before Qwest's 2001 conversion to a new tax system. *See Doc. 169* at 22-23. The City contends that Qwest's use of the confusing "TAR" acronym was designed to "obscure and withhold information from the City," but the Court finds no evidence of this. Nowhere in Interrogatory Nos. 3-15 or 3-16 does the City explain that its interest in "TAR revenues" relates to Bates-numbered document QWEST000699.

Only when the City referenced this document in its Motion to Compel did the alternative meaning of TAR became relevant.  Moreover, "transfer area records" have not been in active use since before 2001, so the Court finds no reason why Qwest should have thought to explain it to the City in earlier discussions.  The Court sees no possible benefit to Qwest by deliberately obscuring the meaning of TAR.  The underlying facts – specifically, the components of its revenue, USOCs and Tax Category IDs since 2001 – remain the same.  Qwest's responses are sufficiently complete.

        I.      <u>Interrogatory No. 3-17</u>

It appears the City has now received all information in Qwest's possession, custody, and control relating to the January 12, 2005 letter written by Larry Tezak.  The Court agrees with the City's comment that Qwest should not have waited until after the City had filed a Motion to Compel in order to even ask Mr. Tezak who else at Qwest may have reviewed and/or approved the letter.  This information is plainly requested and should have been provided in Qwest's original response.  However, it is equally incumbent upon the City to withdraw its Motion with regard to Interrogatory No. 3-17 now that all available responsive information has been produced.  I will therefore consider this portion of the Motion resolved and once again urge counsel to work together more productively.

        J.      <u>Interrogatory No. 3-20 and RFP No. 3-19</u>

The City asks that Qwest identify all competitive local exchange carriers ("CLEC") which utilize Qwest facilities. Based on the information provided by the parties, I find that Qwest has yet to fully respond to these discovery requests.

Qwest has provided that information as to its wholesale customers and need not further

research each of those customers to determine whether it is also a CLEC as that term is used by the NMPRC.  However, I am unconvinced that Qwest need not identify carriers who transfer calls to Qwest for completion because they are merely "sending calls to Qwest for Qwest to complete by utilizing its own facilities."  *See Doc. 169* at 26.  Although such "hand-off" carriers may not pay a lease and instead "are charged a per minute access charge," it appears to the Court that they are indeed using Qwest's facilities.  Qwest shall identify all carriers who "utilize by any means," by lease or otherwise, its facilities.

K.     RFP No. 3-2

The City seeks complete copies of all interconnection agreements between Qwest and any CLEC registered to do business in New Mexico dated January 1, 1995 to the present.  *See Doc. 161-1* at 15.  Although Qwest objects to the request on multiple grounds, it ultimately indicated it would produce these agreements.  *See id.; Doc. 169* at 27.  The City acknowledges this, indicating that it has not yet been able to review the documents as of the date of its Reply.  *See Doc. 178* at 25.  Accordingly, I will consider this portion of the City's Motion to be resolved.

L.     RFP Nos. 3-7 and 3-8

The City seeks documents relating to cost studies conducted by any governmental entities whose ordinances or fees were challenged by Qwest from 1995 to the present and, more generally, "all correspondence, documents and expert witness reports related to or pertaining to a challenge by Qwest to a governmental entities' [sic] ordinance, rule and or law where Qwest's challenge addressed the cost basis of the governmental entities' [sic] ordinance, rule and or law and or the cost impact on Qwest of implementing the governmental entities' ordinance, rule and or law."  *Doc. 161-1* at 18.

10

Qwest objects on the grounds that the requests are overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. *See id.* In particular, Qwest argues that its litigation concerning other franchise agreements has no bearing on the claims or defenses in the instant matter. *See id.* Nonetheless, Qwest refers to the City to its list of other lawsuits filed in connection with franchise agreements in response to Interrogatory No. 3-7. *See id.* In response to the City's Motion, Qwest also indicates it has produced cost studies, correspondence concerning cost studies, and expert reports "for the only two litigation matters concerning payment for use of the public rights-of-way in which Qwest has participated since 1995 in which it received a cost study from the governmental entity." *Doc. 169* at 30. Apparently the City is satisfied, but it also seeks email communications mentioned in QWEST0018934-18938. *See Doc. 178* at 25-26. Those emails are arguably relevant and should be produced.

M.     RFP Nos. 3-9 and 3-10

These requests seek documents relating to revenue received by Qwest in the State of New Mexico and the City . *See 161-1* at 19. Qwest objected to both requests on the grounds that they are overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. *See id.* With regard to RFP No. 3-9, Qwest agreed to produce its annual reports for as far back as it could locate them. *See id.* In response to RFP No. 3-10, Qwest referred to previously produced revenue information at QWEST0007101A-7108A, as well as franchise fee and gross receipts tax returns. *See id.* at 19-20. Qwest also agreed to produce general ledger pages regarding revenue, which are the materials from which the annual reports are prepared. *See Doc. 169* at 31. Qwest reaffirms, in response to RFP No. 3-10, that the documents it has already produced in discovery are "the best available evidence concerning revenues earned

11

within the City for each year since 2002." *Id.* at 33.  However, because the same type of revenue information is not available for the years prior to 2002, Qwest has suggested calculating revenues by projecting backwards for a reliable estimate.  *Id.*

The City is unwilling to do this.  *See Doc. 178* at 27.  Because "Plaintiff has admittedly reduced the revenue streams reported to the City since 2000, any projections of revenues backwards from these reduced bases would not include those revenue items selectively and unilaterally excluded by Plaintiff in calculating its franchise fee obligations to the City."  *Id.*  It appears that Qwest has the sole ability to produce the relevant requested information and should be required to do so.  Insofar as Qwest objects that the requests potentially include "every document related to Santa Fe with a dollar sign on it," it is invited to negotiate with the City to narrow the requested production to a mutually agreeable set of documents that is more manageable and therefore more useful to both sides.

N.    RFP No. 3-11 and 3-12

These requests seek documents relating to Qwest's expenditures in New Mexico from 1996 to the present, including but not limited to infrastructure construction and maintenance, capital investment, and/or operating costs and fees.  *See Doc. 161-1* at 20.  Qwest objected to both requests on the grounds that they are overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence.  *See id.*  Qwest also argues that the requests are cumulative of the documents sought in RFP No. 3-10, which seeks documents related to revenue from all business conducted in the City of Santa Fe.  *See id.*  Despite these objections, Qwest prepared an expenditure spreadsheet of its New Mexico ledger going back to 2006.  *See Doc. 169* at 33-34.  Qwest states that with this information, "the City will have Qwest's best evidence

12

concerning statewide expenditures." *Id.* at 34.  As of March 15, 2012, however, Qwest had not

yet produced this spreadsheet. *See Doc. 178* at 28.  The Court finds that Qwest must produce the

referenced spreadsheet as promised.  Upon production of the spreadsheet, the City may evaluate

whether the Court's continued assistance is required.

        O.        <u>RFP No. 3-1</u>

Because this discovery request is the subject of the supplemental briefing by the parties

and requires a more detailed analysis, it will be addressed in a future memorandum opinion and

order.  *See* Qwest's Surreply *(Doc. 197)* and City's Response in Opposition to the Surreply

*(Doc. 211)*.

        P.        <u>Sanctions Are Not Appropriate</u>

The City requests it attorney fees and costs associated with pursuing this Second Motion

to Compel.  The parties are very aware of my concerns as to the discovery practices both sides

have demonstrated from the very beginning of the discovery process.  Nonetheless, I have been

somewhat encouraged by Qwest's willingness to reexamine its discovery obligations and

supplement its responses after hearing the City's complaints.  Qwest's efforts would be even

more appreciated if they had been triggered by the discovery requests themselves rather than the

City's motions to compel. While noting this progress, I nonetheless caution Qwest against further

delays in discovery.

The City, by contrast, has not withdrawn unreasonable requests or requests that have been

substantively answered.  I cannot reward these tactics by assessing sanctions in the City's favor.

However, the Court is acutely aware of Qwest's delay in producing documents and its effect on

the progress (of lack thereof) of this litigation.  In the event that Qwest does not comply with the

deadline I will set for production of the documents and information ordered herein, I will reconsider the matter of sanctions.

Wherefore,

IT IS ORDERED that the Defendant City of Santa Fe's Second Motion to Compel and for Sanctions *(Doc. 161)* is granted in part as follows, with all supplemental responses in conformance with this Opinion to be served no later than Monday, July 9, 2012:

1.  Qwest must fully respond to the City's Interrogatory No. 3-2 as noted herein;

2.  Qwest must fully respond to the City's Interrogatory No. 3-6, including tracking each distribution area in OSPFM to determine if it is in the City and estimating, to the best of Qwest's ability in the absence of a survey, whether facilities are in the City's rights-of-way;

3.  In response to Interrogatory Nos. 3-13 and 3-14 and RFP Nos. 3-13, 3-14, and 3-18, Qwest must provide responsive documents and information concerning its decision to challenge the City of Santa Fe's ordinance, including preparation of a privilege log so that the City (and the Court, if necessary) can assess the applicability of the attorney work-product doctrine, as well as any general policies and procedures that would apply to Qwest's decision whether to challenge any governmental entity's ordinance;

4.  In response to Interrogatory No. 3-20 and RFP No. 3-19,  Qwest must provide the requested information as to all carriers who utilize by any means, lease or otherwise, its facilities;

5.  Qwest must provide copies of the emails referenced in QWEST0018934-18938 in

14

order to fully respond to RFP Nos. 3-7 and 3-8;

6.       Qwest must fully respond to RFP Nos. 3-9 and 3-10; and

7.       Qwest must provide the spreadsheet referenced in response to RFP Nos. 3-11 and

3-12.

**IT IS FURTHER ORDERED** that the Court takes under advisement the City's Motion

with regarding to RFP No. 3-1 and will address it in a separate memorandum opinion and order.

In all other respects the Motion is denied.

_____

**UNITED STATES CHIEF MAGISTRATE JUDGE**