## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

QWEST CORPORATION,

       Plaintiff/Counter-Defendant,

vs.                                                                No. 10-CV-0617 RB/KBM

CITY OF SANTA FE, a New Mexico
Municipal Corporation,

       Defendant/Counter-Plaintiff.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Qwest Corporation's ("Qwest's") Motion for Summary Judgment on Defendant's Counterclaims (Doc. 264) and Defendant City of Santa Fe's ("City's") Motion for Partial Summary Judgment (Doc. 265). Jurisdiction arises under 28 U.S.C. §§ 1331 and 1332. Having considered the arguments and submissions of counsel, relevant law, and otherwise being fully advised, the Court **GRANTS IN PART** and **DENIES IN PART** both motions.

### I.      Background

The City and Qwest have shared a long history, working together to provide access to telecommunications services for the City's residents. In recent years, the relationship between the City and Qwest has become strained, culminating in this litigation, Qwest's second lawsuit over the City's efforts to alter the fee structure for the use of its public rights-of-way.

Qwest brought the current action challenging the City's most recent telecommunications ordinance, Ordinance 2010-14, amended by Ordinance 2010-33 ("2010 Ordinance"). Pursuant to the 2010 Ordinance, all telecommunication service providers using public rights-of-way will be subject to an annual fee of three percent of the provider's gross revenue. (Ordinance 2010-33,

Chapter 27-2.5(A)(1) SFCC 1987, Doc. 95 Ex. 2). The Ordinance includes various other requirements, and Qwest objects to some of those provisions as well as the annual fee.

Qwest and the City simultaneously filed motions for summary judgment. Qwest seeks summary judgment on all of the City's counterclaims as well as the City's request for punitive damages and attorneys' fees.[1] (Doc. 264). The City opposes Qwest's Motion in its entirety. (Doc. 281). The City seeks summary judgment on its breach of contract counterclaim and all of Qwest's claims, including its Telecommunications Act claim, dormant Commerce Clause claim, breach of contract counterclaim-in-reply, equal protection counterclaims-in-reply, and unjust enrichment counterclaim-in-reply. (Doc. 265). Qwest responded, agreeing that the Court may dismiss Qwest's equal protection and unjust enrichment counterclaims-in-reply but opposing the remaining points in the City's motion. (Doc. 280). Qwest requested in its response that the Court grant summary judgment in its favor on all of the claims raised by the City. (*Id.* at 2-3). The City asks the Court to disregard the request for summary judgment included in Qwest's response, arguing that the request was an improper and untimely cross-motion for summary judgment. (Doc. 293).

## II.    Legal Standard

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in

---

[1] Qwest's request that the Court prohibit the City from seeking attorneys' fees is clearly premature. After trial, the City is entitled to ask the Court to find that an exception to the American Rule applies, entitling it to fees. *See N.M. Right to Choose/NARAL v. Johnson*, 986 P.2d 450, 454-55 (N.M. 1999). The Court cannot determine the City's entitlement to fees at the summary judgment stage.

favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). The party moving for summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted); *see also Celotex*, 477 U.S. at 323. Once the movant meets this burden, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256; *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

The court must view all "evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) (quoting *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1146 (10th Cir. 2007)). The court may neither make credibility determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotation omitted).

Federal courts sitting in diversity "seek to ascertain and apply . . . state law." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (internal quotations omitted). This rule also applies if a federal court exercises supplemental jurisdiction over a state law claim in a federal question case. *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). Accordingly, the Court will apply New Mexico law to the parties' contract and tort law claims.

### III.    Undisputed Material Facts

Relatively few of the facts in this case are agreed upon by the parties. In fact, the City disputes almost all of the "undisputed" facts alleged by Qwest. Accordingly, the Court relies on

3

the text of the agreements executed by the parties and correspondence exchanged between the parties in determining the majority of the facts addressed below.

Qwest has installed and maintained telecommunications facilities in the City's public rights-of-way for decades. (Compl., Doc. 95, at ¶ 1; Ans., Doc. 98, at ¶ 1). To allow Qwest access to the City's rights-of-way, Qwest and the City had a franchise agreement, negotiated and entered by Qwest's predecessor in 1975. (1975 Agreement, Doc. 264 Ex. 1). Section 9 of the 1975 Agreement describes the payments that Qwest must make in consideration for its use of the public rights-of-way. Qwest was to pay a franchise fee of two percent of Qwest's annual "gross receipts."[2] (*Id.* at 5:28). The 1975 Agreement goes on to state, "'Gross receipts' shall include all revenues received from local exchange services." (*Id.* at 5:28-29). The phrase "local exchange revenues" comes up again later in the agreement: "Upon annexation of territory to the City of Santa Fe, local exchange revenues received from subscribers located within the annexed area shall be included in the base for computation of payments due to the City." (*Id.* at 6:29-32). However, the phrase "local exchange services" is not specifically defined.

Pursuant to Section 9 of the 1975 Agreement, Qwest was also required to make a minimum payment, set at $83,160 for the first year of the agreement and increasing 8% annually for the four franchise years thereafter. (*Id.* at 5:30-6:12). Following the expiration of the five-year period, the minimum payment was to be "based upon the linear average annual percentage growth of the Company's gross receipts in the Santa Fe franchise area during the five-year period immediately preceding." (*Id.* at 6:7-9). Payments were to be made quarterly and, in the fourth quarter, the balance of the payment necessary to satisfy the required minimum would be paid. (*Id.* at 6:14-19). The parties refer to this as a "true-up" payment.

---

[2] Though Qwest pays the franchise fee, it passes the fee through to the customer, so the customer ends up bearing the burden of whatever fee is imposed. (Dep. of Robert Barton, Doc. 264 Ex. 9, at 87:2-4).

As part of the consideration for Qwest's payments, the 1975 Agreement included a provision that:

> The foregoing payments shall be in lieu of any and all other franchise, license, privilege, instrument, occupation, excise or revenue taxes and all other exactions (except general ad valorem property taxes, special assessments for improvements, any occupation tax imposed on advertising revenues, and reasonable payments as required by appropriate City ordinance to pay the City for restoration of paving cuts) upon the business, revenue, property, lines, installations, systems, conduits, pipes, fixtures and other appurtenances of the Company or any part thereof in said City during the term of this franchise.

(*Id.* at 6:20-28). Nevertheless, it is undisputed that throughout Qwest's relationship with the City, since at least 1993 to the present, Qwest submitted monthly payments to the State of New Mexico for amounts owed under the gross receipts tax ordinances enacted by the City ("GRT Ordinances"). (Barton Decl. at ¶ 31). Under the GRT ordinances, Qwest paid the City between $253,826.13 and $537,918.78 annually. (*Id.* at ¶ 32).

The 1975 Agreement includes an expiration date: April 9, 2000. (1975 Agreement at 8:1-2). However, included in Section 9, the 1975 Agreement states that Qwest shall pay the City "during the term hereof, and until such time as a succeeding franchise ordinance is adopted, two percent (2%) per annum of the Company's gross receipts." (*Id.* at 5:25-28).

In 1998, prior to the expiration of the 1975 Agreement, the City enacted a new ordinance intended to govern all future access to public rights-of-way by telecommunication service providers, including Qwest ("1998 Ordinance"). The 1998 Ordinance constituted a shift in the rules governing the use of the City's rights-of-way by telecommunication service providers. The City had previously operated under a franchise system, exemplified by the 1975 Agreement; under the 1998 Ordinance, telecommunication service providers were required to register with the City and apply for a lease to install or maintain telecommunications facilities. *Qwest v. Santa Fe*, 224 F. Supp. 2d 1305, 1309 (D.N.M. 2002) ("*Santa Fe I*").

5

Qwest brought an action in federal court challenging the 1998 Ordinance as a violation of the Telecommunications Act, 47 U.S.C. § 253. *See id.* While the litigation was pending, on July 26, 2000, Qwest and the City executed an Interim Agreement. The Interim Agreement acknowledges that the 1975 Agreement "has expired." (Interim Agreement, Doc. 264 Ex. 2, at 1). In order to ensure that telecommunications services were provided to City residents, the parties agreed to preserve the status quo. (*Id.*) Qwest agreed to continue to pay "quarterly payments as per the expired Franchise Agreement." (*Id.* at ¶ 3). The Interim Agreement provided that, "[u]pon resolution of the Declaratory Judgment Action, the prevailing party will be entitled to enforce their rights with respect to the manner and amount of compensation payable (or paid) to the City for use of the rights-of-way." (*Id.* at ¶ 4).

Qwest represents that since 2000, it has based its franchise payments on dial tone services. (Decl. of Robert Barton, Doc. 264 Ex. 6, at ¶ 30). From 1995 to 2001, features such as call-waiting, call-forwarding, and three-way calling were included within the revenue base Qwest used to calculate its franchise fees for the City. (Pl.'s Resp. to Def.'s First Set of Interrogs., Reqs. for Admis., and Reqs. for Produc., Doc. 264 Ex. 7 at 3, 11). When this was discovered in 2001, Qwest removed features from the revenue calculation base except to the extent that they were sold in a bundle with dial tone services. (*Id.* at 11). Qwest modified its systems to segregate bundled features from dial tone in 2004. (Barton Decl. at ¶ 30). Once Qwest adjusted its systems, it issued customer refunds and sent letters to all taxing jurisdictions affected by the adjustment, reducing payments to impacted jurisdictions in amounts that were previously overpaid. (*Id.*; Pl's Resp. to Def.'s First Set of Interrogs., Reqs. for Admis., and Reqs. for Produc. at 11). Three such letters were sent to the City on January 12, August 10, and September 10, 2005. (Qwest Letters, Doc. 264 Ex. 34, at 5-7). Each letter was addressed to "To Whom It

May Concern" and stated that "certain state law and municipal ordinances" require the assessment of fees on "basic exchange services (essentially, dial tone)" but not on features. (*Id.*) The letters provided notice that Qwest had been assessing the fees on features that were bundled with dial tone, but it had developed systems to differentiate between the two and would be offsetting its remittances to the extent it overpaid its fees in the past. (*Id.*)

On August 30, 2002, the district court issued its decision in the original declaratory judgment action. *Santa Fe I*, 224 F. Supp. 2d 1305. The court determined that large swaths of the 1998 Ordinance were preempted by the Telecommunications Act, including the City's entire leasing scheme and one of its registration requirements. *Id.* at 1331-32. It found the remaining provisions of the 1998 Ordinance severable. *Id.* Accordingly, the court granted partial summary judgment in favor of Qwest and partial summary judgment in favor of the City. *Id.* at 1332.

After the district court entered its final judgment, the parties appealed. At that time, Qwest discontinued all payments to the City, including both the two percent quarterly payment and the true-up payment. (Barton Decl. at ¶ 16). The parties exchanged e-mails regarding the consideration due to the City in exchange for Qwest's continuing use of the public rights-of-way. (*See* Barton Decl. at ¶¶ 17-18). On December 2, 2002, Qwest proposed an "Extension of Interim Agreement," which amended the terms of the Interim Agreement to limit Qwest's quarterly payments to "monies actually collected from customers . . . PROVIDED, that Qwest's obligation under this clause is capped, and thus will terminate after Qwest has paid the City an amount equal to the amount that Qwest has already collected from customers . . . ." (Extension of Interim Agreement, Doc. 264 Ex. 21, at ¶ 2). On December 12, 2002, the City responded to Qwest's offer, rejecting it and suggesting that the parties continue to operate under the Interim Agreement. (City's Resp. to Proposal for Extension of Interim Agreement, Doc. 264 Ex. 20).

On March 18, 2003, City Manager Jim Romero sent a letter to Qwest New Mexico President John Badal asserting that, under the City's understanding, the Interim Agreement remained in effect. (3/18/03 Letter from Jim Romero, Doc. 264 Ex. 23). Mr. Romero indicated that the City expected quarterly payments in accordance with the Interim Agreement and the 1975 Agreement. (*Id.*) The City formally rejected the Extension of Interim Agreement and demanded "payment of franchise fees [Qwest] has withheld at the rate established in the Franchise Agreement and the Interim Agreement." (*Id.*) After receiving the letter, Mr. Badal responded, asserting Qwest's position that the Interim Agreement had expired but nonetheless including "a check for payment of outstanding franchise fees, pursuant to the expired Franchise Agreement . . . ." (4/2/03 Letter from John Badal, Doc. 281 Ex. 2). Qwest represents, and the City does not dispute, that it did not make any further true-up payments after the payment for the 2001 year. (Barton Decl. at ¶¶ 20-21). The City accepted the quarterly payments. (Barton Decl. at ¶ 20). City Finance and Budget Director Kathryn Raveling testified in her deposition that, by April of 2003, she was aware Qwest had not made a true-up payment for the 2002 year. (Dep. of Kathryn Raveling, Doc. 264 Ex. 24, at 24:6-9).

On April 28, 2004, Mr. Romero sent another letter to Qwest, this time to the manager of Qwest's state and local transactional tax audit group, Galina Moyzes. (Barton Decl. at ¶ 22). Mr. Romero's letter requested that the City be permitted to review "the calculation and supporting documentation for the fees paid by Qwest to the City of Santa Fe [for 2001, 2002 and 2003] under the requirements of the franchise agreement." (4/28/04 Letter from Jim Romero, Doc. 264 Ex. 25). Mr. Romero further requested copies of Qwest's annual financial audits for the relevant years. (*Id.*) Finally, Mr. Romero acknowledged that the City last received a true-up payment for the calendar year 2001 and stated, "Please provide us information as to when we can expect the

true-up payments to be submitted for calendar years 2002 and 2003." (*Id.*) Ms. Moyzes responded, stating, "The franchise agreement you reference has expired. On July 26, 2000, Qwest and the City of Santa Fe entered into an Interim Agreement. However, that agreement does not provide for financial audits or true-up payments of any kind." (5/28/04 Letter from Galina Moyzes, Doc. 264 Ex. 26). Ms. Moyzes mentioned the status of the pending appeal and went on to state, "In addition, it appears that Qwest may have overpaid the City of Santa Fe when making true-up payments under the franchise agreement. While we may need to address any overpayment by Qwest, it is Qwest's view that we should await the direction of the Court of Appeals in the pending matter before taking any further action." (*Id.*) In the final paragraph, Ms. Moyzes noted that "even if Qwest were to schedule an audit with the City[,]" the City would have to be placed sequentially on Qwest's audit schedule, a process that "could take a significant amount of time." (*Id.*)

On August 24, 2004, the Tenth Circuit affirmed in large part the decision of the district court. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir. 2004) ("*Santa Fe II*"). The court struck more of the requirements included in the 1998 Ordinance and, as a result, found that the entire registration scheme as well as the leasing provisions failed. *Id.* at 1274. Though a few provisions of the 1998 Ordinance remained in effect, the Tenth Circuit's decision gutted the majority of the City's scheme for reimbursement for use of its rights-of-way.

After the Tenth Circuit decision, Qwest continued to make the two percent payments with no annual true-up payment, and the City accepted those payments. (Barton Decl. at ¶¶ 24, 26). After the April 28, 2004 letter from Mr. Romero, the City did not make another demand for true-up payments, nor did the City provide written notice of breach. (Barton Decl. at ¶¶ 28-29).

The two percent payments that Qwest submitted to the City in 2002, the year in which Qwest ceased the true-up payments, totaled $323,790.71. (Barton Decl. at ¶ 34). The annual total has fairly steadily declined, dropping to $164,754.52 in 2011. Of note, the required minimum payment for the 1979 year was $113,138. (1975 Agreement at 6:5).

In 2010, the City again took up the task of crafting a scheme for compensation for telecommunication service providers' use of its rights-of-way. On June 9, 2010, the City passed Ordinance 2010-14 and, in so doing, repealed the 1998 Ordinance. (Ordinance 2010-14, Doc. 95 Ex. 1). Qwest filed this lawsuit challenging various provisions of Ordinance 2010-14 on June 28, 2010. (Doc. 1). After proceedings related to Qwest's motion for preliminary injunction, the City amended Ordinance 2010-14 by enacting Ordinance 2010-33. (Ordinance 2010-33).

The 2010 Ordinance, as revised, purports to apply to all telecommunication service providers using the City's rights-of-way and requires those providers to enter a franchise with the City. (*Id.* at 27-2.2). As compensation for the use of public rights-of-way, the Ordinance requires the providers to pay an annual fee of three percent of the provider's gross revenue. (*Id.* at 27-2.5(A)(1)). Gross revenue is defined as revenue from the provision of telecommunications services to customers from facilities located in the public rights-of-way, including charges paid by customers for all services provided through use of the telecommunications network, fees arising from the use of the network, toll revenue, equipment lease and sale revenue, installation and service fees, and payments received pursuant to a universal service fund requirement. (*Id.* at 27-2.3(A)). Excluded from the definition of gross revenue are proceeds from the sale of assets, revenue collected from customers that must be remitted to an agency as part of a government program, amounts collected for taxes, fees and surcharges, and revenue from the provision of internet access services. (*Id.* at 27-2.3(B)). In addition to the annual franchise fee, providers must

10

submit an application filing fee for each franchise request; initially, the amount is $2,500, but the City is authorized to adjust the fee annually. (*Id.* at 27-2.5(A)(2)). The Ordinance also imposes various non-monetary requirements, including required reporting by line of business, a right to audit the provider with at least thirty days' notice, a six-year retention period for records and accounts, reimbursement of the City's auditing costs if underpayment exceeding five percent of franchise fees is discovered, and the use of "trenchless" technology to the extent feasible. (*Id.* at 27-2.5(B)(3), 2.5(C)(2), 2.5(C)(4), 2.5(C)(6), 2.7(E)(1)(d)).

Under Qwest's calculations, had Qwest been operating under the 2010 Ordinance in 2011, it would have paid the City a total franchise fee of $700,230.87. (Barton Decl. in Opp. to Def.'s Mot. for Summ. J., Doc. 280 Ex. 1, at ¶ 24). Of that, $511,756.74 would have been from Qwest's retail services, $188,442.93 would have been from Qwest's wholesale services, and $31.20 would have been from services provided by other Qwest companies. (*Id.*) Qwest asks the Court to consider the amount Qwest would have owed other jurisdictions in New Mexico had the City's ordinance been effective throughout the State, asserting that the total amount Qwest paid in forty-nine jurisdictions in New Mexico for access to rights-of-way in 2011 was $3,321,940.27. (*Id.* at ¶ 26). Had all jurisdictions adopted the City's franchise fee base, Qwest would have paid $7,665,041.69. (*Id.* at ¶ 27).

## IV.    City's Breach of Contract Counterclaim

The City has asserted a counterclaim against Qwest for breach of the 1975 Agreement based on Qwest's alleged failure to pay two percent of its gross revenues, failure to make true-up payments since 2002, and refusal of the City's audit requests. (Pretrial Order, Doc. 301, at 4). Both the City and Qwest request summary judgment in their favor on this counterclaim, asserting numerous arguments in support.

### a.  Legal Standard

To establish a breach of contract, the City must demonstrate that the parties had a valid agreement concerning Qwest's payment for the use of rights-of-way and that Qwest breached that agreement by failing to make the required payments. *See* N.M. UNIFORM JURY INSTRUCTIONS (Civil) § 13-833. Here, it is not disputed that a contract existed. The nature and terms of any such contract, however, are hotly contested.

The determination of whether a contract's terms are ambiguous is a question of law. *Sanchez v. Borrego*, 86 P.3d 617, 619 (N.M. Ct. App. 2004). A contract is ambiguous if it is "reasonably and fairly susceptible of different constructions." *Id.* If a contract is deemed ambiguous, factfinding is required to determine the meaning of the contract. *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1108 (10th Cir. 2005) (citing *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1999)).

In addition, the City's claims date back to 2002 or prior, raising the possibility that the statute of limitations applies. The limitations period for claims arising from a written contract is six years. N.M. STAT. ANN. § 37-1-3 (1978). The limitations period for an unwritten contract is four years. N.M. STAT. ANN. § 37-1-4 (1978).

### b.  1975 Agreement

The City contends that the 1975 Agreement continues to govern the relationship between the parties, given the language in the contract that Qwest's obligations to the City would continue until the City adopted a new franchise ordinance applicable to Qwest. (*See* Doc. 266 at 7-8). Qwest, on the other hand, asserts that, given the 1975 Agreement's express expiration in 2000, the contract between the parties is an implied-in-fact contract with terms manifested by the parties' conduct. (*See* Doc. 264 at 22-26).

The undisputed material facts demonstrate that the 1975 Agreement expired on April 9, 2000. Indeed, the 1975 Agreement itself includes that expiration date. Moreover, New Mexico law prohibits a franchise agreement extending beyond a twenty-five year period. N.M. STAT. ANN. § 3-42-1 (1978). Accordingly, it is clear that, as a matter of law, the 1975 Agreement expired in 2000.

Section 9 of the 1975 Agreement included language that "until such time as a succeeding franchise ordinance is adopted, [Qwest shall pay] two percent (2%) per annum of the Company's gross receipts." (1975 Agreement at 5:26-28). The City urges the Court that this provision has extended the terms of the 1975 Agreement, or at least Section 9 thereof, to the present. Again, New Mexico law does not permit a franchise agreement to extend beyond twenty-five years. N.M. STAT. ANN. § 3-42-1 (1978); *see also Moongate Water Co. v. City of Las Cruces*, 219 P.3d 517, 524 (N.M. Ct. App. 2009). It is indisputable that Section 9 is an integral part of the 1975 Agreement, given that it sets out the terms for Qwest's payments to the City. It cannot, as the City argues, be construed as separate and apart from the franchise terms. Thus, it is subject to the twenty-five year maximum set out by statute.

Even if Section 9 could continue to operate under the law, it is clear that it was superseded by the Interim Agreement. At the time that the parties entered the Interim Agreement, the City's law regarding telecommunication service providers was in flux. The City had attempted to alter its fee structure by switching from franchise agreements with users of the public rights-of-way to a lease system. Thus, though Section 9 provides for its expiration upon entry into a succeeding franchise, no such franchise agreement was possible at the time. Qwest refused to enter a lease agreement with the City given the litigation that it had initiated. Accordingly, the parties, recognizing that the 1975 Agreement had expired, entered an Interim

Agreement. While the Interim Agreement did not meet the specific requirements of a franchise, a franchise was unavailable at the time. By recognizing that the 1975 Agreement had expired but nevertheless agreeing to abide by its terms and maintain the status quo, the parties substituted a prior agreement with a new one and thereby extinguished any express and severable contract contained within Section 9. *See Richards v. Allianz Life. Ins. Co. of N. Am.*, 62 P.3d 320, 324 (N.M. Ct. App. 2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 279 (1981)).

In support of its position that the 1975 Agreement remains in effect, the City looks to the Tenth Circuit decision in *City of Roswell, N.M. v. Mountain States Tel. & Tel. Co.*, 78 F.2d 379 (10th Cir. 1935). *Roswell*, however, does not support the City. To the contrary, the *Roswell* Court determined that a twenty-five year fixed term franchise between the city and the company had expired by its own terms. *Id.* at 381. Nevertheless, the court held that the city's acceptance of services and payments in exchange for the company's continued use of the streets "constitute[d] an implied agreement of indefinite duration, terminable within a reasonable time after . . . acceptance has ceased." *Id.* at 386.

In accord with *Roswell* and the terms of the 1975 Agreement, it is clear that the express contract between the parties embodied in the 1975 Agreement has expired. Nonetheless, the ongoing relationship between the parties demonstrates that an implied-in-fact contract exists.

### c.  Implied Contract Terms

Though the Court determines as a matter of law that an implied-in-fact contract exists between the parties, the terms thereof are not easily defined. Both the language of the 1975 and Interim Agreements and the parties' course of conduct following the expiration of the Agreements constitute evidence of the implied-in-fact contract's terms. *See Roswell*, 78 F.2d at 378; *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235-36 (N.M. 1993) (citations omitted).

14

The conflicts between the course of conduct and the language in the Agreements, as well as a lack of clarity in the language of the 1975 Agreement itself, generate ambiguities in the terms of the implied contract. The language of the Agreements and the course of conduct by the parties directly conflict as to the true-up requirement. The language in the 1975 Agreement regarding the definition of the phrase "gross receipts" as it relates to the base for the two percent fee is ambiguous, and the parties' submissions highlight the differing interpretations. (*Compare* Dep. of Robert Barton, Doc. 266 Ex. 3, at 81:22 (asserting that Qwest understood the phrase to be limited to "basic dial tone-type services . . . ."); *and* Dep. of Joe Montaño, Doc. 280 Ex. 20, at 20:11-13, 34:20-35:11 (stating that because Qwest's predecessor only offered dial tone services in 1975, that was all that the Agreement contemplated); *with* (Aff. of Harry S. Connelly, Jr., Doc. 266 Ex. 12, at ¶ 6 (stating that, when he negotiated the 1975 Agreement for the City, the parties intended the phrase "gross receipts" to have the statutory definition)). The phrase "local exchange services" is similarly ambiguous, in that the parties offer contrary positions and support for whether or not the phrase includes optional features. Finally, there is a factual dispute, discussed in greater detail below, as to whether the City was aware that Qwest's course of conduct entailed basing the two percent fee exclusively on dial tone services. These disputes constitute genuine issues of material fact and prevent this Court from determining the terms of the implied contract between the City and Qwest.

Nevertheless, the Court agrees with the City that the simple fact that a contract is implied rather than express does not give Qwest the right to pay the City any self-determined amount in exchange for its use of the City's public rights-of-way. (*See* Doc. 281 at 14). Indeed, Qwest has an uphill battle to establish that the implied contract's terms differ from those contained in the 1975 Agreement, for when an agreement expires by its terms and the parties continue to perform

as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. *See, e.g.*, *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946) ("When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old."); *Roswell*, 78 F.2d at 386.

Due to Qwest's failure to comply with the true-up requirement in the 1975 Agreement and the ambiguity within the 1975 Agreement itself, the Court cannot find the governing terms as a matter of law. Instead, the trier of fact must determine the terms of the implied agreement based on the prior written agreements, any representations by the parties, and the parties' course of conduct throughout their relationship.

Given the facts alleged by the City, if the jury finds that Qwest breached the contract, the trier of fact may also consider whether it did so in bad faith or in reckless disregard for the City's interests. *See Paiz v. State Farm Fire & Cas. Co.*, 880 P.2d 300, 307 (N.M. 1994). Accordingly, the Court declines to grant summary judgment as to the City's request for punitive damages.

### d.  Applicability of Statute of Limitations

Given that the Court has determined that the contract between the parties was implied-in-fact rather than written and express, a four-year statute of limitations applies to the City's claims. The City asserts that its breach of contract claim is not time-barred because of factual disputes as to (1) when the breaches were discovered; (2) whether equitable estoppel or fraudulent concealment tolls the statute; and (3) whether there was a continuing wrong in the form of an installment contract. (Doc. 281 at 17).

New Mexico courts follow the discovery rule, meaning that a cause of action does not accrue until the party bringing the claim discovers the factual basis for the claim. *Wilde v.*

*Westland Dev. Co., Inc.*, 241 P.3d 628, 635 (N.M. Ct. App. 2010); *Gerke v. Romero*, 237 P.3d 111, 115 (N.M. Ct. App. 2010). Thus, the City's cause of action accrues when the City discovered or with reasonable diligence should have discovered that Qwest was paying the two percent fee on dial tone services alone and that Qwest stopped making true-up payments. *See Williams v. Stewart*, 112 P.3d 281, 285 (N.M. Ct. App. 2005). The doctrine of equitable estoppel tolls the statute of limitations when one party relies to its detriment on the acts or conduct of the other. *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1429 (10th Cir. 1996) (citation omitted). Fraudulent concealment is another tolling doctrine, applicable when the other party intentionally conceals or misrepresents material facts. *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 74 (N.M. 1993).

It is undisputed that the City knew by 2003 that Qwest was no longer making true-up payments. The letters exchanged between Mr. Romero and Ms. Moyzes demonstrate that the City possessed actual knowledge of this fact. By letter, Mr. Romero demanded information about when to expect past-due true-up payments. Ms. Moyzes responded that the franchise agreement was expired and that Qwest was no longer under an obligation to make true-up payments. The statement in the letter is clear and unequivocal. Though the letter goes on to state that Qwest may have overpaid in the past and any action regarding overpayment should be left until after the resolution of the litigation, that is irrelevant. It is clear that the City had actual knowledge of Qwest's alleged breach with regard to true-up payments after the City received Ms. Moyzes' letter, and the discovery rule does not delay the accrual of this portion of the City's breach of contract claim beyond, at the latest, 2004. Due to the City's actual knowledge, the tolling doctrines are similarly inapplicable.[3] Because the statute of limitations began running in 2004, it

---

[3] The City's continuing wrong or installment contract theory only addresses the franchise fee returns, not the true-up payment requirement. (*See* Doc. 281 at 25-26).

expired in 2008.[4] Thus, the Court finds that the City's claim related to Qwest's failure to make true-up payments is time-barred.

However, as to the two percent payments, the Court cannot conclude as a matter of law that the City knew or reasonably should have known that Qwest made the payments based on dial tone services alone. In the light most favorable to the City, the generic letters that Qwest sent along with payments on three occasions and the court's mention of the payment base within the *Santa Fe I* decision were insufficient to notify the City as to the basis for Qwest's payments.

The Court recognizes that the City bears the burden to demonstrate that it exercised reasonable diligence to discover the claim. *Williams*, 112 P.3d at 285. However, the question of reasonable diligence is generally considered one of fact appropriately decided by the jury. *See id.* at 286 (citations omitted). The City asserts that it had no way to acquire Qwest's financial records aside from submitting an audit request, which it did. The City has sufficiently demonstrated a genuine issue of fact as to the application of the discovery rule. Accordingly, the Court will allow the jury to determine whether the City should have discovered the basis for Qwest's payments more promptly. The statute of limitations does not, as a matter of law, bar this portion of the City's counterclaim.[5]

### e. Qwest's Waiver Argument

Qwest asserts that the City should not be permitted to raise a breach of contract claim because it knew the basis upon which Qwest paid the two percent fee and remained silent as to the alleged breach. (Doc. 264 at 37). The doctrine of waiver requires the City to know of the

---

[4] Even a six-year limitations period would bar the City's counterclaim, which was not asserted until December of 2010. The City's knowledge of Qwest's refusal to make true-up payments is clear from Ms. Moyzes' letter, dated May 28, 2004.

[5] Because the statute of limitations does not bar the City's breach of contract claim based on the franchise fee payments, the Court does not reach the City's other tolling arguments. Further, given the nature of the City's claims, the Court finds that there is a genuine dispute as to whether Qwest's conduct in paying two percent on dial tone services was done in bad faith.

breach. *See State v. Padilla*, 46 P.3d 1247, 1254 (N.M. 2002). However, as explained above, factual issues remain regarding the City's knowledge of the facts supporting its breach of contract claim based on the franchise fee. Given that material factual dispute, summary judgment on this defense is not appropriate.

## V.    Qwest's Breach of Contract Counterclaim in Reply

Qwest asserts that the City breached the 1975 Agreement by failing to exempt Qwest from the City's GRT Ordinances, thereby providing Qwest with an offset against any amounts owed. (Doc. 264 at 41). In New Mexico, any breach of contract claims against a municipality must be brought within three years of the alleged breach. N.M. STAT. ANN. 37-1-24 (1978). Assuming that the City did breach the 1975 Agreement, the undisputed facts demonstrate that Qwest was aware of the breach by 1993 at the latest. Moreover, the 1975 Agreement expired in 2000. Qwest was required to bring its breach of contract claim within three years of becoming aware of the breach, or, at the latest, within three years of the contract's expiration. Qwest's counterclaim in reply is barred by the statute of limitations, and the City is entitled to summary judgment on this claim.

## VI.    City's Tort Counterclaims

The City has brought three counterclaims against Qwest that arise in tort: negligent misrepresentation, fraudulent misrepresentation, and unjust enrichment. Qwest presents similar arguments in support of its motion for summary judgment as to each claim. As such, the Court will address the claims together. Qwest argues that the existence of a contract precludes any equitable remedies and requires the Court to enter summary judgment. Qwest further asserts that the City cannot point to any misrepresentation by Qwest within the applicable four-year

limitation period and that any recovery under an unjust enrichment theory would be limited to the period following December 3, 2006.

### a. Legal Standard

To prove negligent misrepresentation, the City must set forth proof of four elements: (1) a party "made a statement that, though perhaps literally true, is misleading;" (2) that party "failed to exercise ordinary care in obtaining or communicating the statement;" (3) that party intended that the listener "receive and be influenced by the statement;" and (4) it was reasonably foreseeable that the listener "would be harmed if the information was incorrect or misleading." *Bull v. BGK Holdings, LLC*, 859 F. Supp. 2d 1238, 1247 (D.N.M. 2012) (citing *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 953 P.2d 722 (N.M. Ct. App. 1997)); *see also* N.M. UNIFORM JURY INSTRUCTIONS (Civil) § 13-1632; RESTATEMENT (SECOND) OF TORTS § 552 (1977). For the City's fraudulent misrepresentation claim, the City is required to show that (1) the other party made an untrue statement of fact (2) knowing that the statement was false or with reckless disregard for its truth (3) with the intent to deceive and to induce reliance, (4) and the listener did in fact detrimentally rely on the misrepresentation. N.M. UNIFORM JURY INSTRUCTIONS (Civil) § 13-1633; *Saylor v. Valles*, 63 F.3d 1152, 1158 (N.M. Ct. App. 2002). A claim of unjust enrichment requires proof that (1) another knowingly benefitted at the claimant's expense (2) in a manner such that allowing the other the retain the benefit would be unjust. *City of Rio Rancho v. Amrep S.W. Inc.*, 260 P.3d 414, 428-29 (N.M. 2011). A four year statute of limitations applies to each of these claims.  N.M. STAT. ANN. § 37-1-4 (1978).

### b. Impact of the Contractual Relationship

The City has alleged that Qwest made negligent and fraudulent misrepresentations in asserting that it was making payments in accordance with the 1975 Agreement. (Ans. at ¶¶ 40,

46-49). The City further alleges a fraudulent misrepresentation based on its claim that Qwest represented that the City would be permitted to perform an audit. (Ans. at ¶¶ 50-51). Qwest contends that these duties are contractual duties and, as a result, the sole remedy lies in contract.

The Tenth Circuit has strongly cautioned against conflating "the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law . . . ." *Isler v. Tex. Oil & Gas Corp.*, 749 F.2d 22, 23 (10th Cir. 1984). The duty giving rise to the tort claim must exist independent of any contractual obligations. *Elliott*, 407 F.3d at 1116; *Isler*, 749 F.2d at 24. However, the presence of a contractual relationship alone does not extinguish the possibility of tort recovery; indeed, parties in a contractual relationship have a duty of care to act reasonably toward each other, aside from the specific duties set out in the parties' contract. *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1201 (10th Cir. 1988) (citations omitted). As a result, "[a] party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract." *Id.* (citing *Berwind Corp. v. Litton Indus., Inc.*, 532 F.2d 1, 6 (7th Cir. 1976); *DCR, Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983); *Atkinson v. Orkin Exterminating Co., Inc.*, 625 P.2d 505, 511 (Kan. Ct. App. 1981)). But when the "facts alleged in [the] tort claim are precisely the same as those alleged in [the] contract claim[,]" the tort claim is not viable. *Isler*, 749 F.2d at 24.

This case illustrates the difficulties in distinguishing between contract and tort law. The contractual obligation required Qwest to make a specified payment to the City. The City sets forth the alleged tort duty so as to generate an independent duty, asserting that Qwest had a duty to "not provide any negligent or fraudulent misrepresentations to the City on which the City might detrimentally rely." (Doc. 281 at 40). However, the real duty on which the City founds its

misrepresentation claims is the duty to accurately report compliance with contractual obligations. The question, then, is whether the asserted tort duty to report compliance with a contract is separate and distinct from the contractual duty to comply with the contract. *See Elliott*, 407 F.3d at 1116. The Court agrees with Qwest and concludes that it is not.

The duty to comply with a contract and the duty to accurately represent compliance are inseparable. The City's misrepresentation claims center on the fact that Qwest acted intentionally or negligently in misrepresenting the amount owed, but the Tenth Circuit has held that it does not matter why the breach of the bargained-for duty arose. *Isler*, 749 F.2d at 24. "In the marketplace of contract, a breach is a breach is a breach – unless the parties choose to specify otherwise." *Id.* Thus, it does not matter why Qwest allegedly failed to comply with the contract or how the City determined Qwest's noncompliance; all that matters is Qwest's compliance. The City's claims, whether brought via tort or contract, seek recovery for Qwest's asserted failure to make the payments owed.

In *Elliott*, the Tenth Circuit was faced with a similar factual scenario also arising under New Mexico law. Plaintiff and defendant entered a contract obligating defendant to make royalty payments, and defendant retained 39% of the royalty payment as a fee. 407 F.3d at 1099-1100. Plaintiff did not assert a contract claim but did claim, in part, that defendant made misrepresentations regarding the royalty payments, thereby violating the defendant's duty to disclose. *Id.* at 1107, 1115-16. The Tenth Circuit affirmed summary judgment, stating that "[w]hile the relationship between the parties in the instant case is rooted in contract, [plaintiff] has failed to provide this court with any analysis of its tort claims in the context of the express contracts obligating [defendant] to pay royalties." *Id.* at 1116.

The City disputes the applicability of this body of precedent, insisting that these cases are distinguishable because the contracts at issue contained limited liability clauses. While it is undisputed that the parties did not bargain for limited liability, that fact is irrelevant. The contracts discussed in *Isler* and *Hess Oil* did include a clause limiting the parties' liability, but those provisions were not central to the courts' conclusion. Indeed, in *Isler*, a vital portion of the court's analysis included an acknowledgement that an express provision was not required to define the consequences of a breach of contract, stating, "The parties by contract (or in the absence of an express provision, by implied rules evolved under contract analysis) have themselves defined the consequences of the breach." 749 F.2d at 24. In *Hess Oil*, the tort claims alleged, which included negligence in product design, failure to warn of a dangerous condition, and failure to exercise care over employees, parts, and the final product, were clearly distinct from the parties' duties arising from their contract to provide goods. 861 F.2d at 1201 n.1. Finally, there was no indication that the contract in *Elliott* included a limited liability provision.

The City also urges the Court to follow *Bhandari v. VHA Sw. Comm. Health Corp.*, No. CIV 09–0932, 2011 WL 1336512 (D.N.M. Mar. 30, 2011). There, the court considered, in the context of an employment case, whether a claim of misrepresentation could survive summary judgment given that the parties had a contract. *Id.* at 33. The holding in *Bhandari* is inapposite to the issues presented by the City's misrepresentation claims. In *Bhandari*, the plaintiff asserted a claim for breach of contract based on the fact that the defendants did not accord him due process prior to his termination. *Id.* As an alternative claim, in case the factfinder concluded that he was not entitled to due process under the contract, the plaintiff asserted misrepresentation claims based on defendants' actions leading him to believe that he would be accorded due process. *Id.* The court allowed plaintiff to proceed on his misrepresentation claim because the claims were

not "plainly inconsistent." *Id.* With regard to the City's claim, the issue is not whether its contract and tort claims are plainly inconsistent – it is whether the duties asserted are exclusively contractual in nature. The Court has found that they are, and, consequently, the City may not pursue its misrepresentation claims.

Construing the facts and allegations in the light most favorable to the City, Qwest made misrepresentations in the performance of its contractual duties. Therefore, any claim for wrongdoing arises under contract, the City cannot maintain claims for negligent and fraudulent misrepresentation, and Qwest is entitled to summary judgment on these claims.

### c. Unjust Enrichment

Qwest argues that the City's unjust enrichment claim should be dismissed for the same reason as the misrepresentation claims – the obligations of Qwest are governed by contract. Courts interpreting New Mexico law have cautioned that courts should not "resort to the doctrine of unjust enrichment to override a contractual provision." *Elliott*, 407 F.3d at 1117 (quoting *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997)) (alterations omitted). This is because "quasi-contractual remedies are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." *Id.* (quotation and alterations omitted); *see also Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 699 (N.M. Ct. App. 2000).

However, unjust enrichment is widely accepted as an alternative theory of recovery, should the factfinder determine that no contract between the parties exists. *See Starko, Inc. v. Presbyterian Health Plan, Inc.*, 276 P.3d 252, 278 (N.M. Ct. App. 2011) (cert. granted Mar. 30, 2012). This is illustrated by the fact that New Mexico's state rules explicitly allow for alternative pleading of civil claims. *Id.* (citing N.M. R. Civ. P. 1-008(E)(2)). Though the City does not assert

its unjust enrichment claim as an alternative theory of recovery, it cannot recover doubly should the jury find that Qwest underpaid. Accordingly, the Court will deny summary judgment on the City's unjust enrichment claim and will allow the claim to proceed as an alternative theory of recovery.

The City entirely fails to address Qwest's argument that the City be precluded for recovery from any period before December 3, 2006. (*See* Doc. 281 at 37). The Court imputes the arguments that it made in response to the application of the statute of limitations to its other counterclaims. For the reasons discussed above, there are genuine issues of material fact as to whether the City knew about the fee base Qwest used to calculate the two percent payments. Thus, the City may be entitled to tolling of the statute of limitations as to the two percent payments. However, it is clear that the City knew that Qwest was not making, and did not intend to make, true-up payments by 2004. Accordingly, the statute of limitations bars the City's unjust enrichment claim based on true-up payments due prior to December 3, 2006.

## VII.    Qwest's Section 253 Claim

Qwest contends that the City's 2010 Ordinance violates the Telecommunications Act and is preempted by the Supremacy Clause in that the fee increase and five of the non-fee provisions will effectively prohibit Qwest from providing telecommunications services, will limit Qwest's investment in infrastructure, and will inhibit Qwest from providing affordable and competitive services. (Compl. at ¶¶ 51-52). Qwest further asserts that the 2010 Ordinance does not exact "fair and reasonable compensation" as required by § 253(c). (*Id.* at ¶ 54). The City requests summary judgment on this claim, asserting that Qwest has failed to demonstrate that the fee and non-fee provisions are prohibitive. (Doc. 266 at 16-26).

### a. Legal Standard

The Supremacy Clause mandates that federal law preempts state and local law. *See* U.S. CONST. art. VI, cl. 2. Federal statutes preempt local law if it is clear that Congress intended preemption. *RT Commc'ns, Inc. v. FCC*, 201 F.3d 1264, 1269 (10th Cir. 2000). The Telecommunications Act of 1996 provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). The Tenth Circuit has ruled that § 253(a) expresses a clear congressional intent to preempt. *Santa Fe II*, 380 F.3d at 1269. Nevertheless, the Act does allow states and local governments "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis . . . ." 47 U.S.C. § 253(c).

Given the contradictory nature of subsections (a) and (c), the Tenth Circuit considers subsection (c) as an exception to the general rule set out in (a). *See Santa Fe II*, 380 F.3d at 1269. Accordingly, the Tenth Circuit has "adopted a two-step process to test whether a local legal requirement violates § 253(a)." *Qwest Corp. v. Elephant Butte Irrigation Dist.*, 616 F. Supp. 2d 1110, 1118 (D.N.M. 2008).

First, a court must determine whether the challenged requirements "prohibit or have the effect of prohibiting" the provision of telecommunications service. 47 U.S.C. § 253(a); *Santa Fe II*, 380 F.3d at 1269. The prohibitive effect of the local scheme need not be "complete" or "insurmountable." *RT*, 201 F.3d at 1268. Rather, the plaintiff need only show that an individual requirement "materially inhibits" the provision of service. *See Santa Fe II*, 380 F.3d at 1271; *In re Cal. Payphone Ass'n*, 12 F.C.C.R. 14191, 14206 (1997) ("[W]e consider whether the

26

Ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."). Additionally, if the local provisions grant the local governmental entity the power to wield "broad" or "unfettered" discretion over a telecommunications provider, those provisions are most likely prohibitive. *See Santa Fe II*, 380 F.3d at 1270, 1270 n. 9, 1272.

*Santa Fe* offers some further insight into the meaning of "prohibitive effect." The 1998 Ordinance included provisions that required Qwest to obtain an appraisal of the fair market rental value of the right-of-way from a city-approved appraiser, pay the appraisal-based rent, lay twice as much conduit as Qwest actually needed, and transfer all unused conduit to the city. *Santa Fe I*, 224 F. Supp. at 1309. As a result, the cost for Qwest's utility cabinets would quadruple (from approximately $500,000.00 to over $2 million) and the excess conduit requirement would increase Qwest's conduit installation costs by 30% to 59%. *Santa Fe II*, 380 F.3d at 1271; *Santa Fe I*, 224 F. Supp. 2d at 1324-25. The Tenth Circuit characterized the utility cabinet rental fee as "massive" and characterized the combined increases as "substantial costs." *Santa Fe II*, 380 F.3d at 1271.

Only if the court finds a local requirement prohibitive will the court consider whether the safe harbor provision applies. *See Santa Fe II*, 380 F.3d at 1269. Here, the City does not reach the safe harbor in its motion. While Qwest attempts to do so, the Court agrees with the City that Qwest's efforts constitute an untimely motion for summary judgment that denies the City a fair opportunity to respond. Accordingly, the Court will limit its discussion to the first step of the analysis.

### b. Analysis

#### i.    Fee Provisions

Taking the facts in the light most favorable to the non-movant requires the Court to assume that Qwest correctly interpreted the implied contract and owed the City just two percent of its revenue from dial tone services in exchange for access to the City's rights-of-way. Under the facts in the light most favorable to Qwest, then, the Ordinance would more than quadruple Qwest's annual fees within the City, raising the fees from $164,754.52 to $700,230.87 for the 2011 year. Notably, Qwest does not argue that any fee provision of the 2010 Ordinance grants the City unfettered discretion. Rather, Qwest contends that the magnitude of the fee increase establishes effective prohibition.

In *Santa Fe II*, the Tenth Circuit concluded that the City's 1998 Ordinance constituted an effective prohibition. 380 F.3d at 1271. That decision was partly based on the fact that the 1998 Ordinance would nearly quadruple Qwest's cost of doing business in the City. *Id.* The court stated that, by demonstrating quadrupled costs, Qwest proved "that the rental provisions are prohibitive because they create a massive increase in cost." *Id.* Other courts have also found effective prohibition based on an increase in franchise fees. For example, in *Puerto Rico Tel. Co., Inc. v. Municipality of Guayanilla*, 450 F.3d 9 (1st Cir. 2006), the court found that a 5% gross revenue fee significantly and negatively impacted the company's overall profitability given that the company previously paid a 0.5% municipal license tax and the fee, were it imposed across all municipalities in the commonwealth, would present an additional annual cost of $60 million, reducing the company's profit by 86%.[6] *Id.* at 18.

---

[6] The Court notes that this is a far more significant increase in costs than that alleged by Qwest in the instant case. The Court also recognizes that the First Circuit's determination rested, in part, on the company's profitability, and the Court will permit the City to introduce evidence of Qwest's profitability at trial as relevant to the question of prohibitive effect.

In the current litigation, the Court is again faced with the possibility that the City's new Ordinance will quadruple the cost to Qwest of operating within the City. Additionally, Qwest has shown more than a mere possibility that the 2010 Ordinance would quadruple its costs. Indeed, if Qwest is correct in its interpretation of the contract, a factual dispute that the Court cannot resolve, the 2010 Ordinance will result in quadrupled costs. The Tenth Circuit previously found that precise increase "massive" and "prohibitive[.]" *Id.* This Court is bound by the Tenth Circuit's determination and cannot find as a matter of law that the effect of the 2010 Ordinance is not prohibitive. Accordingly, the Court denies the City's motion for summary judgment as to Qwest's § 253(a) claim.

The Court finds it necessary to address one of Qwest's arguments for purposes of clarification. Qwest asserts that because the 2010 Ordinance is revenue-based rather than cost-based, it is prohibitive. This is an incorrect statement of law that improperly conflates the prohibitive effect inquiry with the safe harbor analysis. Though there is no authority in the Tenth Circuit on point, the Court agrees with the Eighth Circuit's well-reasoned opinion in *Level 3 Commc'ns, L.L.C. v. City of St. Louis, Mo.*, 477 F.3d 528 (8th Cir. 2007). The reason for the fee may be considered when courts evaluate whether the fees charged by a municipality are "fair and reasonable[,]" but the issue of fair and reasonable compensation only arises after the company proves that the regulation violates § 253(a). *Id.* at 532. The Court will not allow Qwest to confuse these two inquiries at trial by arguing that the trier of fact should consider whether the fee is revenue-based or cost-based in determining whether the 2010 Ordinance is prohibitive.

### ii. *Non-Fee Provisions*

Though Qwest's claim survives as to the fee provisions of the 2010 Ordinance, Qwest fails to demonstrate that the non-fee provisions have the effect of prohibiting Qwest from

providing telecommunications services. None of the provisions with which Qwest takes issue allow the City "unfettered discretion" to prohibit the provision of services. *Santa Fe II*, 380 F.3d at 1270 (citing *RT Commc'ns*, 201 F.3d at 1268). Furthermore, none of the requirements impose complex processes that significantly burden Qwest. *See id.*

Qwest contends that the non-fee requirements are prohibitive alone and taken together with the fee provisions. Qwest has previously argued that courts should not analyze non-fee provisions separately from the remainder of the ordinance. *See Santa Fe II*, 380 F.3d at 1269. However, the Tenth Circuit found separate analysis permissible so long as the provision "cannot in and of itself prohibit the provision of services." *Id.* Further, the Court found that the 1998 Ordinance as a whole did not constitute "a scheme which prohibits telecommunications service through interrelated provisions." *Id.* at 1271. It was the substantial increase in cost and the free ranging discretion that was problematic, not the entire 1998 Ordinance. *Id.* Similarly, here, Qwest has offered no proof that the entire 2010 Ordinance is prohibitive in effect. Rather, Qwest has argued that the fee and enumerated non-fee provisions are prohibitive. The additional requirements discussed below are entirely distinct from the fee provisions. Accordingly, the provisions may be analyzed without consideration of the entire 2010 Ordinance.

Qwest takes issue with five non-fee requirements: pro rata assessment of bundled services, line of business reporting, thirty-day notice of audits with a six-year record retention requirement, City choice of audit location, reimbursement of City audit costs, and mandatory "trenchless engineering" where practical. Qwest presents no evidence and little argument in response to the City's argument that these provisions are not prohibitive as a matter of law. Qwest asserts that the assessment on bundled services and reporting by "line of business" are different from Qwest's current reporting systems. (Doc. 280 at 50). Presumably, Qwest believes

the audit provisions grant the City discretion to choose the location of the audit, require increased expenses for Qwest, and conflict with other law. (*Id.*) Finally, Qwest believes that the trenchless engineering potentially grants the City discretion over Qwest's construction process. (*Id.*)

As to the audit requirements, Qwest misinterprets the provisions of the 2010 Ordinance. The 2010 Ordinance clearly allows the City and the provider to negotiate a longer term for notice, as it states that the City must provide notice of "not less than 30 days, or such other time as may be agreed upon . . . ." (2010-33 Ordinance, Section 27-2.5(C)(2)). While the 2010 Ordinance does require providers to maintain records for a six-year period, as Qwest acknowledges elsewhere in its motion, New Mexico's statute of limitations for breach of contract actions is six years. *See* N.M. STAT. ANN. 37-1-3. Thus, this requirement is logical and not burdensome. The location provision asserts that the audit shall occur on the provider's premises within the City – it does not allow the City to choose the audit location. (*See* 2010-33 Ordinance, Section 27-2.5(C)(5)). Further, the provider is only required to reimburse costs if the provider makes the auditor travel outside of the City for purposes of conducting the audit or if the auditor discovers substantial underpayment. (*Id.*, Section 27-2.5(C)(5), (6)).

The preference expressed in the 2010 Ordinance for trenchless engineering is just that – a preference. The provision does not grant the City unfettered discretion. It is merely a statement that, as it is feasible, the provider must employ trenchless technologies. The City does not retain authority under the Ordinance to stop projects that fail to employ trenchless technologies.

Finally, as to all provisions, Qwest fails to present any evidence of a cost increase. Qwest's mere assertions in its brief of unspecified costs are insufficient to withstand summary judgment.

Because none of the requirements grant the City unfettered discretion and Qwest has presented no evidence demonstrating a cost increase due to the requirements, Qwest has not met its burden to show that the non-fee provisions of the 2010 Ordinance have a prohibitive effect. Accordingly, there are no genuine issues of material fact as to the non-fee provisions, and the City is entitled to summary judgment as to this portion of Qwest's § 253 claim.

## VIII.   Qwest's Dormant Commerce Clause Claim

The City contends that it is entitled to summary judgment on Qwest's dormant Commerce Clause claim because the Telecommunications Act authorizes local regulation of public rights-of-way, therefore rendering relief unavailable to Qwest as a matter of law, and because the 2010 Ordinance does not discriminate against the free flow of interstate commerce or differentially treat in-state and out-of-state economic interests.

### a.   Legal Standard

The Commerce Clause of the United States Constitution provides, "The Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. Although phrased as an express grant of power to Congress to regulate interstate commerce, "the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). This 'negative' aspect is called the dormant Commerce Clause.

Though there are different analyses that can be employed under the dormant Commerce Clause, Qwest's claim focuses on just one. Qwest asserts that the 2010 Ordinance violates the dormant Commerce Clause because, though it "regulates evenhandedly to effectuate a legitimate local public interest[,]" it imposes a burden on interstate commerce that is "clearly excessive in

relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). When interstate discrimination is not involved, the Tenth Circuit assesses "a dormant Commerce Clause challenge to a local measure under the *Pike* balancing test." *Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Rogers*, 27 F.3d 1499, 1511 (10th Cir. 1994). Under the balancing test, the court must determine whether the ordinance has a legitimate local purpose and, if it does, the extent of the burden on interstate commerce, the nature of the local interest, and whether the local interest "could be promoted as well with a lesser impact on interstate activities." *Id.* (citing *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *Pike*, 397 U.S. at 142).

However, local government action that is specifically authorized by Congress "is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Mass. Council of Const. Emp'rs, Inc.*, 460 U.S. 204, 213 (1983) (citation omitted); *see also Sw. Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1177 (10th Cir. 2001). In the Telecommunications Act, Congress expressly granted local governments authority to manage their public rights-of-way in accordance with the requirements of § 253(a) and (c). *See BellSouth Telecomm., Inc. v. City of Mobile*, 171 F. Supp. 2d 1261, 1279 (S.D. Ala. 2001).

### b. Analysis

Qwest only briefly addresses the City's argument that no dormant Commerce Clause violation may be asserted because the City's action was authorized by Congress. However, the few courts to consider this specific argument have held that, where the charges for use of municipal rights-of-way comport with the requirements of the Telecommunications Act, no claim under the Commerce Clause is available. *BellSouth Telecomms., Inc. v. City of Mobile*, 171 F. Supp. 2d 1261, 1280 (S.D. Ala. 2001); *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 127 F. Supp. 2d 1348, 1356-57 (S.D. Fla. 1999) (reversed in part on other grounds). *But see*

*Qwest Commc'ns Corp. v. City of N.Y.*, 387 F. Supp. 2d 191, 195 (E.D.N.Y. 2005) (allowing claims under § 253 and the dormant Commerce Clause to proceed at the motion to dismiss stage, but not addressing issue of Congressional authorization to regulate).

In § 253 of the Telecommunications Act, Congress expressly manifested an intent to allow local governments to regulate the use of their public rights-of-way by telecommunications providers. However, the grant of authority by Congress was not absolute: local regulations may not prohibit or have the effect of prohibiting an entity's ability to provide telecommunications services unless the local regulation requires fair and reasonable compensation on a competitively neutral and nondiscriminatory basis. *See* 47 U.S.C. § 253(a), (c).

At this point, the remaining factual issues related to Qwest's § 253 claim impede the Court's determination of whether the 2010 Ordinance is the sort of regulation that Congress authorized. If it is determined that the Ordinance does not violate § 253, rendering it a valid exercise of the City's authority to manage its public rights-of-way, then the Ordinance complies with Congress' grant of authority and no dormant Commerce Clause claim is available. However, if the Ordinance does violate § 253, it was not authorized by Congress, and Qwest may assert a dormant Commerce Clause violation. Because of the factual issues remaining as to Qwest's § 253 claim, it is premature for the Court to evaluate Qwest's dormant Commerce Clause claim at this time. Accordingly, the Court will defer ruling on the City's request for summary judgment on this claim until after the trier of fact resolves the remaining factual issues.

**THEREFORE,**

**IT IS ORDERED** that Qwest's Motion for Summary Judgment on Defendant's Counterclaims, filed September 14, 2012 (Doc. 264), is **GRANTED IN PART** and **DENIED IN PART**. Qwest's motion is granted as to the City's negligent and fraudulent misrepresentation

counterclaims and the City's breach of contract counterclaim based on true-up payments. It is denied as to the City's unjust enrichment counterclaims and all other aspects of its breach of contract counterclaim, as described herein.

**IT IS FURTHER ORDERED** that the City's Motion for Partial Summary Judgment, filed September 14, 2012 (Doc. 265), is **DENIED IN PART**, **GRANTED IN PART**, and **DEFERRED IN PART**. The City's motion is denied to the extent it requests summary judgment on its breach of contract counterclaim and Qwest's § 253 claim based on the fee provisions of the 2010 Ordinance. It is granted to the extent it requests summary judgment on Qwest's counterclaims-in-reply and Qwest's § 253 claim based on the non-fee provisions of the 2010 Ordinance. It is deferred to the extent it requests summary judgment on Qwest's dormant Commerce Clause claim.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**
