IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

QWEST CORPORATION,

       Plaintiff,

vs.                                     CV 10-0617 RB/KBM

CITY OF SANTA FE,

       Defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Qwest Corporation ("Qwest") and the City of Santa Fe ("City") have a long, contentious history. Since at least the early 1900s, Qwest and its predecessors have maintained facilities in the City's public rights-of-way to provide telecommunication and other services to its customers, and the City has charged fees for Qwest's use and occupation. Given the pressures on both parties to maximize revenue, it is unsurprising that they again appear before this Court. Though the parties and issues are familiar, Qwest's position relative to the City has changed substantially over time. Qwest once wielded significant power over the City as the monopoly provider of telecommunication services; now, the law and the market have forced Qwest to compete with other providers. As the monopoly provider, Qwest invested substantial capital in infrastructure; now, Qwest is the provider of last resort and is required, by law, to install and maintain that infrastructure, though advances in technology and increased competition have reduced the customer base and rendered such infrastructure nonessential.

This matter is now before the Court on Qwest's claims that the City's latest ordinance governing the fees payable to the City for the occupation and use of the public rights-of-way by

1

telecommunication service providers, enacted in 2010 and amended in 2010 and 2012 (the "2010 Ordinance"), violates Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253, and the dormant Commerce Clause. The Court conducted a five-day bench trial in July 2013. After considering the evidence adduced in the course of trial, the arguments of counsel, relevant law, and otherwise being fully advised, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1.      Qwest is a telecommunication carrier that is organized and exists under the laws of the state of Colorado, with its principal place of business in Monroe, Louisiana. Qwest is a subsidiary of CenturyLink, Inc. and does business under the "CenturyLink" trade name. Qwest provides wholesale and retail services throughout a fourteen-state region to residential and business customers, including customers located within the City of Santa Fe.

2.      Defendant City of Santa Fe ("City") is a municipality organized and incorporated pursuant to the laws of the State of New Mexico.

3.      Qwest provides a variety of retail and wholesale services through its network. The primary retail service that Qwest provides is basic dial tone, or local exchange service, which is the simple ability to make a telephone call within the local network. Qwest also offers retail customers advanced features, including call forwarding, call waiting, caller ID, three-way calling, and voicemail. Qwest provides limited long distance, or toll, service. In New Mexico, Qwest's toll service allows customers to complete calls within the state. For business customers, Qwest provides a private line service in addition to its other services. That private line is a dedicated circuit that enables a business to establish

connections between various office locations. In addition to retail services, Qwest offers wholesale services including switched access service, which allows a long distance carrier to terminate or originate a call within Qwest's local network. Qwest charges the long distance carrier a per minute fee for switched access. A second category of wholesale products involves the lease of elements of Qwest's local network, as mandated by the Telecommunications Act, 47 U.S.C. § 251(c). Qwest provides both unbundled network elements and dedicated circuits, also known as special access service. Unbundled network elements are parts of Qwest's network including portions of circuits, switches, and cables that transport calls, while special access service is a complete circuit akin to the private line that Qwest offers to business customers. Both unbundled network elements and special access service give Qwest's competitors dedicated access to Qwest's network, enabling them to provide telecommunication services to their customers. Finally, Qwest offers an internet access product.

4.      To provide these services, Qwest utilizes a wireline system and must locate at least some of its telecommunication facilities on or under public rights-of-way, including streets, trenches, ditches, and sidewalks. Places of service, such as residences, are connected to Qwest's network through one or more "drop lines." A drop line is, essentially, a wire that runs into a home through which telecommunication service is provided. The drop line connects the house to what is called a pedestal. At the pedestal, several drop lines are joined into a larger cable. If placed underground, the larger cable runs through a four-inch pipe, called conduit, from the pedestal to an interface, referred to as a cross-connect or cross-box. Alternatively, the cable could be attached to a pole above ground. From the cross-connect, the cable and conduit or poles run to the central office, or switch. As the

conduit and cable approach the central office, they become larger, thus requiring more underground access. Throughout the network, the conduit is connected through splicing vaults and utility holes, which allow technicians to access the conduit and cable. As explained by Rachel Torrence, a director within CenturyLink's Regulatory Operations Department who has an engineering background and extensive experience working for Qwest and its predecessors, Qwest places cabling structures, utility holes and splicing vaults in the public rights-of-way. However, Qwest's more expensive electronics, including the central office and cross-connects, are typically located in private easements.

5.    Within Qwest's service area in New Mexico, Qwest is the incumbent local exchange carrier ("ILEC") and the provider of last resort. CenturyLink's State Legislative Affairs Director, Leo Baca, explained that Qwest's designation as the ILEC means that it is obliged by law to unbundle elements of its network and lease these elements to competitors at cost-based prices. Additionally, Qwest's tariff with the New Mexico Public Regulation Commission ("PRC") requires it to act as the provider of last resort, which means that Qwest must provide telecommunication service when requested by a customer. Qwest is obligated to lay telecommunication lines in new developments so that service can be provided if requested and to connect customers within 1,000 feet of a terminal at no additional cost.

6.    For the use of the public rights-of-way in the City and approximately forty-five other New Mexico jurisdictions, Qwest pays fees pursuant to franchise agreements. Qwest has historically recovered these fees by charging them to its customers located in the city that imposes the fee, a practice known as pass-through.

7.    From 1975 through 2000, the City allowed Qwest and its predecessor to install and

maintain telecommunication facilities in the City's public rights-of-way pursuant to a franchise agreement signed in 1975 ("1975 Agreement") by Qwest's predecessor, Mountain States Telephone & Telegraph. This agreement was executed when Mountain States was the monopoly provider of telecommunication service in the City. Mountain States and Qwest's earlier predecessors operated in the City under similar franchise agreements dating back to the 1930s. These agreements were likewise executed when Qwest's predecessors were monopoly providers.

8.      Under the 1975 Agreement, Qwest annually paid the City two-percent of revenues generated from local exchange services to customers with service addresses in the City.[1] The 1975 Agreement also set a minimum annual payment by Qwest – $83,160 for the first year and increasing by eight-percent annually for the succeeding four franchise years. After the first five years, the minimum payment was to be "based on the linear average annual percentage growth of the Company's gross receipts in the Santa Fe franchise area during the five-year period immediately preceding." Qwest's payments to the City were made quarterly, and any balance of the payment necessary to satisfy the required minimum, which the parties referred to as a "true-up" payment, was paid in the fourth quarter.

9.      In addition to the franchise fee, the City imposed one-time charges on Qwest for individual permits necessary to install and maintain facilities in the rights-of-way, called street cut permits.

10.     The term of the 1975 Agreement was twenty-five years, and it expired on April 9, 2000.

---

[1] There was a dispute over the payment term contained within this and all subsequent contracts between the City and Qwest. The City filed four counterclaims against Qwest related to that dispute. On June 6, 2013, after a six-day jury trial, the jury found that the base for the franchise fee payments pursuant to all contracts at issue, including the 1975 Agreement, was limited to local exchange service revenue.

11.     Prior to the expiration of the 1975 Agreement, the City enacted a new ordinance intended to govern all future access to and utilization of its rights-of-way by telecommunication carriers, Chapter 27 SFCC 1987 ("1998 Ordinance"). The 1998 Ordinance replaced the franchise fee system with a scheme that, among other things, required telecommunication carriers to register with the City, obtain an appraisal of the relevant right-of-way's value each time they sought to obtain a permit, and pay an annual fee to lease the right-of-way based on the appraisal.

12.     Upon the expiration of the 1975 Agreement in 2000, Qwest filed a lawsuit against the City in federal court, contending that the fees resulting from the lease/appraisal system in the 1998 Ordinance were unlawful under Section 253 of the Telecommunications Act. *Qwest v. Santa Fe*, 224 F. Supp. 2d 1305 (D.N.M. 2002) ("*Santa Fe I*").

13.     Because they were in litigation concerning the lawfulness of the 1998 Ordinance, the parties executed an "Interim Agreement" on July 26, 2000, agreeing to "preserve the status quo." Pursuant to that agreement, Qwest paid the City two-percent of revenue from local exchange services for use of the public rights-of-way pending a decision by the court as to the lawfulness of the appraisal system. Qwest ceased all further true-up payments.

14.     On August 30, 2002, the Court held that certain provisions of the 1998 Ordinance were preempted by Section 253, including the lease/appraisal provisions, and it enjoined these provisions. *Santa Fe I*. The Tenth Circuit affirmed. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir. 2004) ("*Santa Fe II*").

15.     Upon the Court's 2002 decision in the prior litigation, the Interim Agreement expired by its terms.

16.     Since 2002, the parties have operated pursuant to the terms of an implied contract under which Qwest has made, and the City has accepted, payments based on two-percent of Qwest's revenue from local exchange services provided to customers with service addresses in the City (the "Implied Contract").

17.     The jury trial held from May 30 through June 6, 2013, confirmed that Qwest's franchise payment obligation to the City from 1975 forward was two-percent of revenue from local exchange services.

18.     Qwest's total franchise fee payments to the City for each of the years in the period 1995 through 2012 were as follows:

| Year | Franchise Fee Paid |
|------|--------------------|
| 1995 | $475,449.46 |
| 1996 | $499,221.93 |
| 1997 | $524,183.03 |
| 1998 | $550,392.18 |
| 1999 | $577,911.79 |
| 2000 | $601,028.26 |
| 2001 | $625,069.39 |
| 2002 | $323,790.71 |
| 2003 | $322,782.88 |
| 2004 | $283,731.85 |
| 2005 | $187,031.35 |
| 2006 | $253,368.11 |
| 2007 | $238,724.67 |
| 2008 | $222,616.12 |
| 2009 | $206,071.91 |
| 2010 | $184,048.05 |
| 2011 | $164,754.52 |
| 2012 | $159,667.81 |

19.     Beginning in 2000 or 2001, Qwest began to experience access line loss. Access lines are the lines that provide a customer with dial tone service. In the 1990s and before, Qwest, as the monopoly provider, anticipated a one-hundred percent return on its infrastructure, with every household subscribing to wireline telephone service. Qwest experienced

access line gain every year as New Mexico's population grew. However, in the early 2000s, Qwest's access line gain stagnated, and then the trend reversed. Between 2001 and 2012, Qwest's access lines in New Mexico declined by fifty-two percent, from approximately 850,000 to approximately 400,000. (Ex. 59). Throughout the same period, residential local access lines[2] in New Mexico remained relatively constant, ranging between eighty-nine percent and ninety-three percent. A study by the Centers for Disease Control in 2011 found that thirty-six percent of households in New Mexico were wireless-only households, meaning that there is no wireline service utilized by the house. This demonstrates that Qwest's customer base in New Mexico for dial tone is shrinking, though the demand for telephone service remains constant and the population in New Mexico is growing. Nevertheless, though a customer may discontinue dial-tone service with Qwest and be counted among these lost access lines, that customer may receive internet services from Qwest through its wireline network and may purchase dial-tone service from a Qwest competitor that utilizes a leased portion of Qwest's wireline network.

20.     In 2009, the City was prompted to draft an ordinance that would replace the 1998 Ordinance when it received approximately four inquiries from telecommunication service providers, including CityLink Fiber Holdings, Inc. ("CityLink"), New Path, NextG, and ExteNet, regarding installing infrastructure in the City. A larger company had expressed an interest in contracting a system within the City, and some of these providers were contemplating bids for the project.

21.     On June 9, 2010, the City repealed and replaced Chapter 27 SFCC 1987 by enacting Ordinance 2010-14. Ordinance 2010-14 has twice been amended, once in 2010 and once

---

[2] This includes wireless telephone service.

in 2012. The ordinance as amended is herein referred to as the "2010 Ordinance."

22.     On June 28, 2010, Qwest filed this lawsuit to challenge Ordinance 2010-14 and moved for a preliminary injunction. Qwest claimed that the franchise fee provision and several non-fee provisions in Ordinance 2010-14 were unlawful under Section 253 and the dormant Commerce Clause.

23.     This Court held preliminary injunction hearings on September 30 and October 21, 2010. The City stated at the conclusion of the hearings that it would further revise Ordinance 2010-14.

24.     On December 12, 2010, the City enacted Ordinance 2010-33 to amend Chapter 27 SFCC 1987. Based on these revisions, Qwest withdrew its preliminary injunction motion.

25.     On its face, the 2010 Ordinance applies to all telecommunication carriers with facilities in the City's public rights-of-way. However, the only companies that offer voice service via their own infrastructure in the City's public rights-of-way are Qwest and Comcast. Though the 2010 Ordinance certainly applies to Qwest, its applicability to Comcast is uncertain, as discussed *infra*.

26.     As compensation for the use and occupancy of the City's public rights-of-way, the 2010 Ordinance requires telecommunication service providers to pay an annual franchise fee. That fee is described as follows:

> As partial compensation for the use of the public rights-of-way, each telecommunications services provider shall be subject to an annual fee of three percent (3%) of the provider's gross revenue or for providers with telecommunications networks and/or facilities in the public rights-of-way that do not provide telecommunications services within the city three percent (3%) of that portion of the provider's gross revenue attributable to the provider's telecommunications networks and/or facilities within the city and not limited to revenues derived from the provision of telecommunications services within the city.

(Exhibit 10, § 27-2.5(A)(1)).

27.     The 2010 Ordinance provides the following definition for the phrase "gross revenue:"

    A.     Includes the following types of provider revenues derived from the provision of telecommunications services to customers within the city served from telecommunication facilities located in the public rights-of-way:

        (1)     Recurring, nonrecurring and usage charges by customers for telecommunications or other services provided through use of the telecommunications network;

        (2)     Revenues received from access fees, interconnection fees, or any other fees relating to or arising out of the use of the telecommunications network (including the facilities and equipment of such network) by any person providing commercial mobile radio service, cellular, personal communications service, or other communications service;

        (3)     Interlata (local access transit area) toll revenue;

        (4)     Intralata toll revenue;

        (5)     Equipment lease and sale revenue not to include revenue from the sale or lease of equipment that is readily available in the consumer retail market;

        (6)     Installation and service fees;

        (7)     Data transport or network charges;

        (8)     Any amounts collected by a provider from its customers denominated as reimbursement for expenses of construction, equipment and related expenses paid by provider for the benefit of its customers; or

        (9)     Payments received by a provider from any federal or state agency or other carriers pursuant to any universal service fund requirement.

    B.     Excludes the following types of revenue derived from the provision of telecommunications services to customers within the city limits:

        (1)     Proceeds from the sale of bonds, mortgages, or other

evidence of indebtedness, securities or stocks;

(2)     Bad debt write-offs and customer credits;

(3)     Revenue from direct advertising;

(4)     Any amounts collected by a provider from its customers that are required to be remitted to a federal or state agency as part of a universal service fund or other government program;

(5)     Amounts collected for taxes, fees or surcharges and paid to the federal, state or local governments;

(6)     Any franchise fee or tax; or

(7)     Revenue from the sale or lease of equipment that is readily available in the consumer retail market.

(8)     Revenue from the provision of internet access services as defined in the Federal Internet Tax Freedom Act, 47 U.S.C. § 151, but only to the extent prohibited by law.

C.      Gross revenue as set forth above shall be interpreted consistent with FCC regulations and rulings, and any relevant decision by a federal court and to the fullest extent allowed by applicable law. Any change in federal law subsequent to the effective date of a franchise shall not affect the definition of gross revenues unless the change specifically preempts one of the components of the definition. Gross revenue shall be measured and monitored periodically by the city. As telecommunications services continue to advance and evolve, the definition of gross revenues will be read based on the intent reflected in the above list. When a bundling of services is offered by a provider that includes services included in gross revenues or excluded from gross revenues there will be a pro rata allocation between franchise fees based services and nonfranchise fee categories based on the provider's product usage rate.

(Exhibit 10, § 27-2.3).

28.     Under the 2010 Ordinance, the franchise fee base includes several classes of service that were not included in the base as defined in the prior contracts between the City and Qwest. Specifically, the 2010 Ordinance expands the base to include advanced feature,

11

toll service, private line, switched access, unbundled network element, and special access revenue.

29.     City Attorney Kelly Brennan, who was ultimately charged with drafting and revising the 2010 Ordinance, initially believed that the 2010 Ordinance did not expand the base. It was her understanding that the 1975 Agreement required Qwest to pay two-percent of its gross revenues without limitation. Based on that understanding, she thought that the 2010 Ordinance merely increased the fee by one percentage point.

30.     The Court finds that the plain language of the 2010 Ordinance is limited to two scenarios: one that allows telecommunication service providers with customers in the City to obtain a franchise and one that allows telecommunication service providers without customers in the City to obtain a franchise. Only the option for telecommunication providers without customers in the City requires facility-based payments; the option applicable to Qwest is, for the most part, limited to the services provided to customers within the City.

31.     In one scenario, referred to as the long-distance call to the City scenario, the 2010 Ordinance will require Qwest to determine the extent to which a call travels over facilities in the City's public rights-of-way and allocate the earned revenue accordingly. When another company's customer outside of the City places a call to a Qwest customer within the City, the other company utilizes Qwest's network in and around the City to enable the call to reach its final destination. The company pays Qwest a per minute fee for the limited use of Qwest's network. Qwest will be required to pay a franchise fee on this income source, to the extent Qwest's network within the City limits is utilized by the other company.

32.     Each of Qwest's central offices for its network provides telecommunication service to

customers within a certain range. That range, called a wire center, is delineated based on the gauge of the cable and the geography of an area. Two wire centers serve City customers. However, the boundaries of those wire centers do not correspond to the boundaries of the City. Instead, the City straddles the two wire centers, but the wire centers are far larger than the City itself, providing service throughout the surrounding area.

33.    Qwest does not currently track the extent to which a call placed through these two wire centers travels through the City's rights-of-way. However, the 2010 Ordinance would require Qwest to do so in order to allocate the revenue earned from the long-distance call to the City scenario.

34.    The 2010 Ordinance also imposes various non-fee requirements, including: required reporting by line of business; the right to audit the provider with at least thirty days' notice; a six-year retention period for records and accounts; reimbursement of the City's auditing costs if underpayment exceeding five percent of franchise fees is discovered; and the use of "trenchless" technology to the extent feasible.

35.    The Court has already determined that Qwest failed to establish any prohibitive effect resulting from the non-fee provisions of the 2010 Ordinance.[3]

36.    Had Qwest been operating under the 2010 Ordinance in 2012, it would have paid the City a total franchise fee of $693,703, $194,462 of which would have been from Qwest's wholesale services. The $693,703 projected franchise fee was not contested by the City, though the City asserts in its Closing Brief that Qwest's claims as to the cost increases are

---

[3] Though Qwest attempted to raise points of alleged discretion resulting from non-fee provisions in the 2010 Ordinance at trial and in its post-hearing brief (Doc. 475), the Court will not address these arguments further as it has already determined as a matter of law that Qwest failed to demonstrate any prohibitive effect flowing from the alleged discretion. (Memorandum Opinion and Order, Doc. 303).

contested.[4] (Defendant City of Santa Fe's Closing Brief, Doc. 474, at 18). The City further claims that this is the maximum possible cost increase (*id.* at 19), though the evidence demonstrates that some revenue streams subject to the 2010 Ordinance are not currently tracked by Qwest in a manner that would enable it to determine the impact of the fee.[5] Thus, the Court finds that the projected franchise fee in the City, $693,703, is uncontested and represents the minimum amount due pursuant to the 2010 Ordinance. That amount is four times the amount Qwest actually paid in 2012 and an increase of $534,035, or a three-fold increase.

37.     In all other jurisdictions in New Mexico that have franchise agreements with Qwest, with the exception of the City of Albuquerque, the base for the franchise fee is local exchange services. Similarly, in the two other states in Qwest's service area with cities that impose franchise fees on Qwest, Wyoming and Oregon, the agreements are limited to local exchange services. In the City of Albuquerque, the base is slightly expanded and includes revenue from advanced features and private line service in addition to local exchange service. (Ex. 28). No jurisdiction includes wholesale revenue in the franchise fee base.

38.     If the 2010 Ordinance is approved by the Court, it is reasonable to believe that other jurisdictions in New Mexico that already have franchise agreements with Qwest will adopt similar franchise ordinances. First, the 2010 Ordinance implements a franchise fee that is akin to the franchise fees charged in municipalities throughout the state; it merely expands the base. Thus, municipalities would not need to diverge from the franchise fee scheme in order to adopt a similar ordinance. Second, though some of Qwest's franchise agreements in New Mexico have recently been renewed, the City of Belen renewed its

---

[4] The City has clearly contested Qwest's calculations of the increase on a statewide basis, as discussed *infra*.
[5] See the discussion of the long-distance call to the City scenario, *supra*.

prior franchise with Qwest for a short term, just two years, because it was aware of the 2010 Ordinance and the instant litigation. Other jurisdictions are operating pursuant to expired franchise agreements. Both the City of Albuquerque and the City of Taos considered but did not pass franchise ordinances contemplating a fee based on gross revenue rather than dial tone service. Third, cities are members of the municipal league, participate in an annual conference, and, as admitted by Ms. Brennan, talk to each other about issues confronting them. It is reasonable to believe that the cities discuss their franchise agreements. Indeed, the City of Rio Rancho inquired of Santa Fe City Attorney Geno Zamora about the City's current franchise fees. Ms. Brennan herself looked to other cities' franchises when drafting the 2010 Ordinance. Finally, the expert witnesses for both parties testified that municipalities tend to look to one another for guidance on franchises. The evidence demonstrates that other municipalities are aware of the 2010 Ordinance and the instant litigation, they have delayed or shortened the term of their franchise agreements as a consequence, and they could adopt a similar ordinance without altering the entire franchise fee scheme. *Compare with Qwest Corp. v. Elephant Butte Irrigation Dist.*, 616 F. Supp. 2d 1110, 1125 (D.N.M. 2008) (finding that, absent proof that other municipalities were moving in the direction of a fee schedule as opposed to a franchise fee, it was unrealistic to assume that all municipalities would adopt a similar fee schedule). It is reasonable to infer that the other municipalities that receive franchise fees from Qwest will follow the City's lead, should the Court affirm the 2010 Ordinance. Consequently, the Court finds it reasonable and appropriate to consider the impact of the 2010 Ordinance throughout the state of New Mexico in all jurisdictions that currently impose franchise fees.

39.     In 2012, Qwest paid a total of $3,331,854 in franchise fees to the approximately forty-five jurisdictions in New Mexico that require franchise payments. Had the 2010 Ordinance been in effect in all New Mexico jurisdictions in which Qwest had franchises in 2012, Qwest's payments would have totaled $7,690,516. The implementation of the 2010 Ordinance in all New Mexico jurisdictions with franchise agreements would more than double Qwest's payments throughout the state, increasing the fees by $4,358,662.

40.     However, Qwest's argument that jurisdictions without franchise agreements will enact a similar ordinance solely due to the 2010 Ordinance is wholly speculative. Though Bernalillo County is considering adopting a similar ordinance, Qwest acknowledged that New Mexico counties have not generally required it to enter franchise agreements. (Plaintiff Qwest Corporation's Post-Hearing Brief, Doc. 475, at 10). Additionally, counties are limited to imposing fees designed to recover their costs, and at least one court has determined that New Mexico counties may not charge franchise fees based on a provider's revenue. *See* N.M. STAT. ANN. § 62-1-3; *Bd. of Cnty. Comm'rs of Grant Cnty. v. Qwest Corp.*, 169 F. Supp. 2d 1243, 1250-51 (D.N.M. 2001). Given Qwest's long history of occupying and using the public rights-of-way in certain areas of the state without the payment of franchise fees, the Court finds that it is inappropriate and inaccurate to speculate on the impact of the 2010 Ordinance were it enacted statewide.

41.     Given the possibility that other jurisdictions with existing franchise agreements would adopt ordinances like the 2010 Ordinance, the definition of gross receipts contained within the 2010 Ordinance poses additional problems aside from the mere increase in fees. Were multiple jurisdictions to adopt similar ordinances, private line service and special access service, could be subject to franchise fees in two locations though they

constitute a single service offering. Robert Barton, an employee leased by Qwest from Synergy Services Corporation with over thirty-five years' experience with Qwest including over twenty years within Qwest's Tax Department, ten of which he spent researching and analyzing the impact of state and local taxation on Qwest, explained that if Albuquerque adopted a similar ordinance, revenues derived from a single private line between the cities of Santa Fe and Albuquerque would be subject to franchise fees in both locations.

42.     It is undisputed that the 2010 Ordinance was not based on the City's costs in relation to the use and occupation of the public rights-of-way, nor was it based on an estimate of the revenue that the franchise fee would generate.

43.     Indeed, Ms. Brennan determined that the City need not conduct a cost study and that the fee could be set based on a survey of surrounding communities. She did not consult with any City employee responsible for managing the public rights-of-way.

44.     Dr. William Fitzsimmons, Qwest's expert in the areas of economics and telecommunications, who has extensive experience conducting financial analyses related to the Telecommunications Act on behalf of telecommunication service providers, analyzed the activities performed by nine jurisdictions in connection with utilities' access to public rights-of-way. The analysis did not include any jurisdiction in New Mexico. Dr. Fitzsimmons determined that, as a general matter, the costs incurred by a city in relation to the use and occupation of the public rights-of-way include the costs to review permit applications, issue permits, inspect any work done in the rights-of-way, and map the location of the facilities in the rights-of-way. Though the City was not among the jurisdictions surveyed, it is reasonable to believe that the City's costs derive from the

same activities.

45.     David Catanach, Division Director of the City's Streets and Drainage Maintenance

Division with the Public Works Department, testified as to some of the costs incurred by

the City related to the management of the public rights-of-way. Mr. Catanach's division

is responsible for maintaining the streets and drainage infrastructure in the City, including

snow removal, street sweeping, road grading, pavement maintenance, and storm water

management. There are twenty-five employees within the division, three of whom are

assigned to permits and street cut inspections and one of whom is responsible for

administering street cut applications, and several hundred employees within the Public

Works Department. A street cut permit is required for a utility to access its aerial or

underground facilities in any way, regardless of whether it will actually cut into the

pavement. In 2011, Mr. Catanach did an assessment for the prior three years of the

average number of permits pulled per year and the cost incurred by the City in overseeing

the street cut process. On average, 859 permits were pulled annually, and the majority of

these permits were pulled by a utility for the purpose of accessing infrastructure. The cost

to the City for street cut inspections and administration, including the cost of labor,

supplies, equipment, fuel, uniforms, and other miscellaneous expenses was $234,608.

Based on that assessment, the City increased the cost of street cut permits from $100 to

$200. Additionally, the City charges a penalty for cutting into pavement that is less than

five years old, and the City increased that penalty in 2011 from $10 per square foot to

$20 per square foot. Even given the increases, Mr. Catanach determined that the City

would not recoup all costs. Given the average number of permits and penalty fees for the

three year period, the City would only recoup $201,800, a shortfall of $32,808. (*See* Ex.

33).

46.     Mr. Catanach did not intend his study to be an all-inclusive analysis of the cost of
        managing the public rights-of-way. He did not include the expenses for office space or
        the cost of his review of the permits, and Dr. Fitzsimmons acknowledged that those
        expenses should be included to render an accurate cost assessment. Ms. Brennan implied
        in her testimony that other costs are involved in the management of the public rights-of-
        way, stating that "a bunch" of departments aside from the Streets and Drainage
        Maintenance Division are involved in the management of the City's public rights-of-way.
        However, she did not elaborate on which departments are involved or what they do with
        respect to the public rights-of-way. As such, the only credible evidence with respect to
        the City's costs in managing the public rights-of-way relates to the expenses of the
        Streets and Maintenance Division.

47.     The 2011-2012 operating budget for the Streets and Drainage Maintenance Division was
        $2.86 million.

48.     There was some dispute as to whether the City incurs additional costs in relation to the
        use of the public rights-of-way from street degradation. Though Dr. Fitzsimmons opined
        based upon his review of the studies that road degradation from street cuts has not been
        proven, Mr. Catanach testified based on his experience that street cuts in the City
        commonly lead to cracking and reduce the lifespan of roads. The Court finds Mr.
        Catanach's testimony on this point persuasive and agrees that it would be appropriate to
        include the costs incurred by the City due to road degradation in a complete cost
        assessment.

49.     Qwest cites to its expenses in maintaining its network in the City and adding new

facilities to argue that the fee imposed by the 2010 Ordinance represents a significant portion of those annual capital expenditures and maintenance costs. In 2010, Qwest spent approximately $1.6 million on construction and maintenance in the City. In 2011 and 2012, that amount was approximately $3 million. The $693,703 in franchise fees that would result under the 2010 Ordinance represents over twenty percent of the 2012 amount.[6]

50.     Qwest has four main categories of competitors in the telecommunication services market: wireless providers, cable telephony, nomadic or over-the-top voice over Internet Protocol ("VoIP"), and competitive local exchange carriers ("CLECs").

51.     The first category of competitors, wireless carriers, includes AT&T, Verizon, and Sprint. Wireless telephones send signals to an antenna, which connects to a switched network. These carriers locate cell towers and other communication network components on private property. Ultimately, the cell towers are connected to the telecommunications network by private line circuits, which enable the wireless call to be transmitted to its ultimate destination. The wireless company purchases or leases that infrastructure. The sale or lease of infrastructure to wireless providers is referred to as wireless backhaul, and it is a highly competitive market. Wireless providers utilize competitive bidding to award this business, and Qwest is often among those submitting bids. Because wireless carriers do not maintain facilities in the public rights-of-way, they will not be subject to the 2010 Ordinance.[7]

---

[6] Qwest made a similar comparison in *Elephant Butte*, 616 F. Supp. 2d at 1124. The Court determined that the argument was of "questionable value" because, unlike the City's 1998 Ordinance, the ordinance at issue in *Elephant Butte* did not mandate certain construction requirements. *Id.* Similarly, in the instant matter, the 2010 Ordinance does not require Qwest to incur additional costs related to construction or maintenance. Thus, the Court simply includes Qwest's construction and maintenance budget to contextualize the fee increase.
[7] The franchise fee under the 2010 Ordinance would be assessed against any Qwest revenue from wireless backhaul within the City.

52.     Another significant competitor is cable telephony. In the City, cable providers began offering voice communication service in 2009, and the primary provider is Comcast. Comcast provides voice communication service through VoIP, which is transmitted over Comcast's cable modem internet access service. Comcast's service differs from nomadic VoIP because it travels on a dedicated and managed network, which means that the service is provided through a private network and is tied to a particular address. Comcast's network is quite similar to that of Qwest, though the cables used differ. Comcast has a franchise agreement with the City that requires it to pay five percent of its gross revenues derived from video service. Comcast's VoIP service is not included within the franchise fee base, and Comcast does not have any franchise relating to the provision of voice services. The parties strongly dispute whether Comcast's voice services would be subject to the 2010 Ordinance, and the City has taken various positions over the years. (*Compare* Ex. 15, *with* Brennan Bench Trial Testimony). Comcast's franchise agreement reserves the company's right to provide any service over its cable system that is not prohibited by law and further states, "In the event of a conflict between the Franchise Agreement and the Telecommunications Ordinance, the Franchise shall control." (Comcast Franchise Agreement, Ex. 29, §§ 7.1, 7.4). While the City claims that there is no conflict (*see* Doc. 474 at 49), it is plain that Comcast's franchise allows Comcast to provide a variety of services through its cable system, including dial tone service, for which it cannot be subject to additional fees. Moreover, Robert Brigham, a Regulatory Operations Director for Qwest with over thirty-five years' experience working for Qwest and its predecessors and extensive experience in competitive analysis and cost studies, explained that Comcast does not consider its VoIP product to be a

telecommunications service. Should Comcast's interpretation prevail, the 2010 Ordinance would not apply to its services. While there is insufficient evidence to determine whether the 2010 Ordinance applies to Comcast's VoIP product, the plain language of Comcast's franchise agreement demonstrates that Comcast would not be subject to any fees on VoIP until its current franchise expires in 2018.

53.     Other Qwest competitors provide telephone service through nomadic VoIP. A nomadic or over-the-top VoIP provider enables a customer with a broadband connection, which can be provided by Qwest or another company, to obtain dial tone service. Customers using a nomadic VoIP carrier can access their telephone service from any location so long as an internet connection is available. A nomadic VoIP provider does not maintain facilities in the public rights-of-way, but it does use those facilities to provide voice communication service. Because these providers do not maintain facilities in the public rights-of-way, they will not be subject to the 2010 Ordinance.

54.     The final category of competitors, CLECs, provide telecommunication services either through their own facilities or through unbundled network elements leased from another provider, such as Qwest. Unbundled network elements include local loops that connect the customer to the central office, switches, and transport that takes the call to its ultimate destination. As a result of leased unbundled network elements, CLECs are able to purchase a portion of Qwest's network to allow their customers' calls to travel over Qwest's lines. Unbundled network elements are sold at cost-based prices established by the PRC. CLECs primarily target business customers, though they do provide residential service to a lesser extent. In the City, CLECs do not have telecommunication facilities in the public rights-of-way but instead lease capacity from Qwest. Thus, no CLEC operating

within the City would be subject to the 2010 Ordinance.

55.   Wireless carriers and CLECs are also, to at least some extent, customers of Qwest in the City in that these competitors utilize and compensate Qwest for the use of Qwest's infrastructure within the City.

56.   Since passing the 2010 Ordinance, the City received applications from two telecommunication service providers, Cybermesa and ENMR/Plateau, to operate within the City pursuant to the 2010 Ordinance, as well as an inquiry from a third telecommunications provider. No additional evidence regarding these applications and inquiries was adduced. At least one competitor of Qwest, CityLink, opposed the 2010 Ordinance. The owner of CityLink, John Brown, approached the City in March of 2008 to discuss obtaining a franchise agreement so CityLink could expand its network. (Ex. 140 at ¶ 5). Mr. Brown found the franchise fee requirement of three-percent on the expanded base unacceptable, particularly because CityLink would be required to pay the fee on services having nothing to do with the public rights-of-way, such as on-site customer service and software service. (*Id.* at ¶¶ 7-8). Mr. Brown also found other aspects of the 2010 Ordinance "troubling." (*Id.* at ¶¶ 9-10). CityLink decided not to build a network in the City because of the ordinance. (Ex. 140 at ¶ 13). While these objections predated the amendments to the 2010 Ordinance, CityLink has not expanded its network to the City to date. Additionally, though two of the other companies that inquired with the City about franchises in 2009 commented on the draft ordinance, none ultimately applied for a franchise agreement with the City.

57.   Qwest has an extensive network of infrastructure within the City's public rights-of-way. As of early 2012, Qwest had two wire centers serving the City and two wire centers

outside of the City with some facilities extending into the City. The feeder facilities for the two wire centers within the City have four-inch underground conduit totaling 28.4 RT miles,[8] containing buried fiber and copper totaling 54.4 RT miles. (Ex. 133). Additionally, each wire center has 65 cabinets (identified as "SAI" with average dimensions of 60.2 inches (height), 42.1 inches (width) and 16.7 inches (depth)). In addition to these underground facilities, Ms. Torrence estimated that, within one wire center in Santa Fe, there are 7,300 poles with Qwest attachments, 2,700 of which are Qwest-owned poles. From the evidence presented, the Court cannot determine whether these facilities extend throughout the entire wire center or are limited to facilities within the City. Qwest annually pulls approximately 100 permits in the City for maintenance and/or construction of its infrastructure.

58.     Qwest is not the sole user of the City's public rights-of-way, and the City receives franchise payments from other utilities, though none aside from Qwest are paying fees based on telecommunication services. Teresita Garcia, the City's Assistant Finance Director, testified that the City also receives franchise payments from the New Mexico Gas Company, the local gas utility; the Public Service Company of New Mexico ("PNM"), the local electric company; and Comcast, the cable provider within the City. Because the City has operated the water and wastewater utility since approximately 1996, it receives no franchise fees from this utility. All of these companies and utilities have facilities in the City's public rights-of-way.

59.     For the fiscal year ending in 2012, the City received a total of $2,516,008.55 in franchise fees from Qwest, PNM, Comcast, and the New Mexico Gas Company under their respective franchise agreements with the City. Qwest paid 6.4% of the total franchise

---

[8] This term of measurement was not defined.

fees, the least in percentage terms. PNM paid 50.4% of the total fees received, the gas company paid 17.9%, and Comcast paid 25.3%. (Ex. 181).

60.     The franchise fee payments from all of these services, including telephone, are placed in the City's general fund, with the exception of some fees from the cable company that are allocated specifically to public education grants. The City utilizes the general fund extensively, and it is not restricted to use for the administration of the public rights-of-way.

61.     As demonstrated by data from the PRC, Qwest has proven profitable in the State of New Mexico. Indeed, in New Mexico in 2012, Qwest's net income was $83.9 million. However, the degree of Qwest's profitability and the impact of the 2010 Ordinance thereon have been hotly contested issues throughout these proceedings.

62.     The City's economic expert, Dr. Michael Ileo, who has extensive experience in the fields of economics and telecommunications, completed an analysis of Qwest's profitability based on the PRC data. Dr. Ileo assessed Qwest's profitability using a "return on investment" standard designed to measure the company's attractiveness to investors.

63.     Dr. Ileo's profitability calculations included two main parts. First, he compared the rate of return on Qwest's annual net plant and equipment investment for New Mexico against the rate of return on Qwest's annual net plant and equipment investment for Qwest's fourteen-state region. To do so, he divided Qwest's net profits in New Mexico and throughout the region by the respective investment amount. He found that Qwest was twice as profitable in New Mexico as compared to the entire service region. Next, Dr. Ileo imputed Qwest's earnings in Santa Fe based on its statewide earnings and an estimate of the urban-to-rural subsidy, which he explained as the increased earnings of

25

telecommunication providers in urban areas due to the higher population per square mile. He then considered the impact of the 2010 Ordinance on Qwest's earnings rate statewide and in the City.

64.   Dr. Ileo's analysis demonstrates that Qwest's profitability in New Mexico greatly exceeds Qwest's profitability in its service area throughout the country. In New Mexico in 2012, Qwest's net income was $83.9 million, the net value of Qwest's assets in New Mexico totaled $437.9 million, and its net sales totaled $522.6 million. Dr. Ileo opined that Qwest's earnings rate in 2012 was 19.15%, which he calculated by dividing net profits by assets. Across Qwest's fourteen-state region, its return rate on investment as to net profits was just 9.06%. However, these return rates account for depreciation, as Qwest's total capital expenditure on plants and equipment in New Mexico is $2.6 billion. Calculating the return on investment considering Qwest's total network investment would lead to much lower rates of return, and no evidence was presented as to this rate throughout Qwest's fourteen-state region.

65.   Dr. Ileo imputed Qwest's total investment earnings in the City of Santa Fe, including interest earnings, as $6.6 million. With net plant and equipment investment in the City estimated at $20.9 million, Dr. Ileo concluded that Qwest's earnings rate in the City was 31.60% in 2012 and would only be reduced by 2.41% were the 2010 Ordinance in effect.

66.   The Court shares several of Qwest's concerns related to Dr. Ileo's analysis. First, because Qwest only tracks its revenue on a state-wide basis, it is impossible to accurately compare the impact of the 2010 Ordinance to Qwest's profitability in the City. However, approximations can be reached either through Dr. Ileo's estimation of earnings in the City or by utilizing the projected numbers for all municipalities in the state with franchise

agreements. Second, Qwest's net income numbers include revenue generated from Qwest's internet access product, which is not subject to the 2010 Ordinance. As such, the analysis underestimates the impact that the 2010 Ordinance will have on the profitability of Qwest's voice telecommunications products. Third, Dr. Ileo's calculations did not reflect the entire amount of capital expenditures on Qwest's network, which totaled $2.6 billion in New Mexico; instead, depreciation was deducted from the investment amount. Dr. Ileo did not explain his rationale for utilizing current value of investment rather than total capital expenditures. Fourth, Dr. Ileo's calculation of the numerator for the earnings rate assessment, Qwest's earnings, was inexplicably inconsistent between the two portions of his analysis. Specifically, in calculating the earnings rate in the second part of his analysis and imputing Qwest's earnings in Santa Fe, Dr. Ileo added interest expenses to net profits. Statewide, the addition of interest expenses increased Qwest's earnings by over $25 million and increased the earnings rate by 6.13%. Dr. Ileo did not explain the addition of interest expenses in the second calculation, and, as a result of the addition, the projected impact of the 2010 Ordinance on Qwest's profitability was substantially reduced. Finally, the Court is not persuaded that the company's earnings rate and its consequent attractiveness to investors is the appropriate gauge by which to measure the impact of a fee on a company's profitability.

67.     Despite these concerns, having considered the opinion of Dr. Ileo and the PRC data upon which he relied, the Court finds that Qwest has been quite profitable in New Mexico since at least 2007.[9]

68.     The Court further agrees with Dr. Ileo that Qwest will remain profitable in New Mexico

---

[9] Dr. Ileo characterized Qwest's profitability in New Mexico as exceptional. However, no baseline for comparison was established, such as the profitability of other telecommunication providers in New Mexico. As a result, the Court cannot espouse Dr. Ileo's characterization.

regardless of the franchise fees imposed by the City. Dr. Ileo testified that Qwest's rate of return in New Mexico is twice its rate of return in the rest of its fourteen-state service region. Dr. Ileo opined that Qwest's profitability is even greater in urban areas, such as Santa Fe, Albuquerque and Las Cruces, because of the urban-to-rural subsidy based on the higher population per square mile. However, Dr. Ileo also conceded that the competition among telecommunication service providers is greater in urban centers as compared to rural areas, thus reducing the extent of the subsidy.

69.     Despite Qwest's profitability, the numbers also reveal that Qwest's net income from operating revenues is decreasing, with a total decrease between 2007 and 2012 of approximately $42 million, or 7.5%. This decrease in revenue occurred despite population growth and inflation in New Mexico over the six-year period.

70.     Qwest's economic expert, Dr. Fitzsimmons, presented an alternative method to evaluate the impact of the 2010 Ordinance on Qwest's profitability. Specifically, he compared the increase in costs resulting from the 2010 Ordinance directly to Qwest's net profits. Because Qwest only tracks income on a statewide level, Dr. Fitzsimmons relied on the grossed up estimate of the impact of the 2010 Ordinance if implemented statewide. As stated above, it is unrealistic to assume that the entire state of New Mexico will adopt the 2010 Ordinance, so the Court does not take Dr. Fitzsimmons' calculations at face value.

71.     However, the Court does find Dr. Fitzsimmons' method of calculating the impact of the 2010 Ordinance on profitability persuasive. Utilizing Dr. Ileo's estimate of Qwest's net profit in the City as $6.6 million, acknowledging that it is imputed based on what Dr. Ileo testified was a conservative estimate of the urban-to-rural subsidy but also includes interest revenue and internet service revenue, the franchise fee increase of $534,035

would reduce Qwest's profits by 8.1%. This rough estimate of the 2010 Ordinance's impact demonstrates that, though Qwest will remain profitable, the 2010 Ordinance will undoubtedly have an impact on profitability. Indeed, it is undisputed that Qwest would remain profitable even if it absorbed the fee increase resulting from the 2010 Ordinance and the fee increase would not put Qwest out of business.

72.     Another strongly contested issue at trial related to Qwest's ability to pass through the fee increase and the resulting impact on customer retention. The Court finds that it is reasonable to infer that the fee increase, to the extent Qwest is able to pass it on to customers and assuming Qwest passes it on to the full extent, would exacerbate Qwest's access line loss. The Court notes that, within the last few years, the PRC authorized Qwest to increase its rates for local exchange service by $3 to be phased in over a three-year period. That increase represented twenty-two percent of the bill for flat-rate residential service. Mr. Brigham testified before the PRC that he could not precisely forecast how the price increase would impact customer retention, though an increase likely would not impact telephone subscriber penetration levels. However, that does not equate with the notion that it would not impact Qwest's share of the subscribers. The City has argued that the increase due to the 2010 Ordinance would only represent $.17 on a customer's bill, much less than the $3 rate increase on dial tone. That calculation is based upon the increase of a single percentage point; in making its calculation, the City entirely ignores the expanded base for its franchise fee. The difference in the fee would be more than $.17 for those residential customers who pay for at least some advanced features and toll service in addition to basic dial tone. The fee would also be significantly greater for those business customers who purchase private lines in addition to advanced features and

toll services. And the fee could represent a three-percent increase on Qwest's bids for wireless backhaul. While the franchise fee increase, assuming it were passed on in full, would not represent as substantial a percentage increase as the $3 rate increase on dial tone alone, the Court finds it reasonable to believe that the fee increase could cause Qwest to lose current and potential customers.

73.     Even if customer retention is not impacted by the fee, price increases do impact Qwest's profit margin, the money it has to invest in its network and infrastructure, and its performance in the competitive telecommunication marketplace.

74.     Though Mr. Baca, on behalf of Qwest, has advocated in the New Mexico legislature for a tax applicable to all telecommunication service providers in lieu of franchise fees in individual jurisdictions, the Court cannot find that this is a viable alternative to franchise fees. Mr. Baca's efforts have not proved successful, though he has worked on this issue for many years. Additionally, the Court finds that Qwest did not establish that the City could exact a tax on all telecommunication service providers that provide services to customers within the City.

## CONCLUSIONS OF LAW

### I.      Jurisdiction

This Court has federal question jurisdiction over Qwest's claims pursuant to 28 U.S.C. § 1331. The Court has authority to issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201-02. Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the City is located in this District, the rights-of-way at issue are in this District, and the events giving rise to this action occurred in this District.

## II.        Telecommunications Act

The Supremacy Clause mandates that federal law preempts state and local law. *See* U.S. CONST. art. VI, cl. 2. Federal statutes preempt local law if it is clear that Congress intended preemption. *RT Commc'ns, Inc. v. FCC*, 201 F.3d 1264, 1269 (10th Cir. 2000). Section 253(a) the Telecommunications Act of 1996 provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). The Tenth Circuit has held that Section 253(a) embodies a clear congressional intent to preempt local ordinances that prohibit the provision of telecommunication services. *Santa Fe II*, 380 F.3d at 1269.

Congress' purpose in enacting the Telecommunications Act of 1996 was "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). To do so, Congress preempted state and local regulations that have a prohibitive effect on the provision of telecommunication service. 47 U.S.C. § 253(a). At the same time, however, Congress recognized the continuing need on the part of state and local governments to regulate providers in order to protect consumers, ensure public safety, and obtain compensation for the use of their rights-of-way. *P.R. Tel Co., Inc. v. Municipality of Guayanilla*, 450 F.3d 9, 15 (1st Cir. 2006). Consequently, the Act includes a provision allowing state and local governments "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis . . . ." 47 U.S.C. § 253(c).

31

Given the contradictory nature of these subsections, the Tenth Circuit considers subsection (c) an exception to the general rule set forth in subsection (a). *Santa Fe II*, 380 F.3d at 1269. To determine whether a local requirement violates Section 253, the Tenth Circuit has enumerated a two-step analysis. *Elephant Butte*, 616 F. Supp. 2d at 1118. First, Qwest must prove that the challenged provisions "prohibit or have the effect of prohibiting" the provision of telecommunication service. 47 U.S.C. § 253(a); *Santa Fe II*, 380 F.3d at 1269. A prohibitive effect can be shown through proof that an individual requirement "materially inhibits" the provision of service. *See Santa Fe II*, 380 F.3d at 1271; *In re Cal. Payphone Ass'n*, 12 F.C.C.R. 14191, 14206 ¶ 31 (1997). The prohibitive effect of the local scheme need not be "complete" or "insurmountable." *RT*, 201 F.3d at 1268. In *Santa Fe II*, the court found that the 1998 Ordinance, which quadrupled the operating cost for Qwest in at least one area, had a prohibitive effect. 380 F.3d at 1271.

Only if the court finds a local requirement prohibitive will the court consider whether the exception applies. *See Santa Fe II*, 380 F.3d at 1269. The Tenth Circuit has adopted a totality of the circumstances test to determine whether compensation rates are fair and reasonable. *Elephant Butte*, 616 F. Supp. 2d at 1119 (citations omitted). The relevant factors include: "(1) the extent of the rights of way use contemplated by the telecommunications provider, (2) whether the use will be exclusive or nonexclusive, (3) the amount other telecommunications providers would be willing to pay for the use of the right of way, (4) the impact on the profitability of the telecommunications provider, and (5) whether the plaintiff had previously agreed to pay similar fees." *Id.* (citations and footnote omitted).

### a. Prohibitive Effect

Any local regulation that prohibits or effectively prohibits the ability of a company to provide any interstate or intrastate telecommunication service is preempted by Section 253. 47 U.S.C. § 253(a). The FCC has explained that a regulation is prohibitive only if it materially inhibits or limits "the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment in the [relevant] market . . . ." *Cal. Payphone*, 12 F.C.C.R. at 14209 ¶ 38. "A regulation need not erect an absolute barrier to entry in order to be found prohibitive." *Santa Fe II*, 380 F.3d at 1269; *see also, RT*, 201 F.3d at 1268-69 (holding that the challenged regulation need not be "insurmountable" to be preempted).

In prior litigation between these parties, the Tenth Circuit determined that the fee provisions of the 1998 Ordinance, which would nearly quadruple the cost to Qwest of doing business in the City, were prohibitive. *Santa Fe II*, 380 F.3d at 1271. The court found that the cost increase alone demonstrated that the provisions were "prohibitive because they create a massive increase in cost." *Id.* While the court assumed that not all cost increases would create a prohibition, the three-fold increase in costs was sufficient to demonstrate that the fee provisions of the 1998 Ordinance would "materially inhibit" the provision of services and were prohibitive under Section 253. *Id.*

The fee provision of the 2010 Ordinance, like the rental payments pursuant to the 1998 Ordinance, would, at least, quadruple Qwest's costs in the City. Qwest's 2012 payment to the City under the Implied Contract was $159,668. Had the 2010 Ordinance been in effect, Qwest's franchise payment would have been $693,703. This constitutes an increase of $534,035, or a three-fold increase from the 2012 payment. Under the standard set forth by the Tenth Circuit, that increase alone is sufficient to demonstrate that the fee provision of the 2010 Ordinance

would "materially inhibit" the provision of services, and it establishes that the fee provision is prohibitive under Section 253.

Recognizing that the ratios are equivalent between this case and *Santa Fe II*, the City attempts to distinguish *Santa Fe II*. First, the City asserts that the case relied upon by the Tenth Circuit in rendering its decision, *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1176 (9th Cir. 2001), has been overruled by the Ninth Circuit. *See Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008). The Ninth Circuit overruled *Auburn* to the extent that *Auburn* interpreted the word "may" in Section 253(a) as meaning "might possibly." *Id.* The Court held that a plaintiff suing a municipality under Section 253 must show "actual or effective prohibition . . . ." *Id.* However, the Tenth Circuit in *Santa Fe II* determined that the massive cost increase required by the 1998 Ordinance would materially inhibit the provision of services; it did not hold that the massive cost increase might possibly inhibit the provision of services. As such, the holding of *Santa Fe II* remains undisturbed by the Ninth Circuit's decision overruling *Auburn*.

Next, the City argues that the 2010 Ordinance is not prohibitive because it does not inhibit the provision of a specific service, as was the case in *Cal. Payphone*, 12 F.C.C.R. 14191. However, this contention does not negate the fact that the 2010 Ordinance would quadruple Qwest's costs, a massive cost increase that the Tenth Circuit has previously deemed, in and of itself, prohibitive. *Santa Fe II*, 380 F.3d at 1271. Additionally, *Cal. Payphone* is factually distinguishable from the instant case. There, the FCC was asked to consider a city's regulations related to the installation of payphones in the public rights-of-way. 12 F.C.C.R. at 14191 ¶ 5. The organization bringing the challenge argued that the regulations were preempted because they erected an insurmountable barrier to entry into the market for payphone service. *Id.* at 14198 ¶

15. Understandably, then, the FCC evaluated the impact of the regulations on the provision of payphone service. Here, the challenged ordinance does not impact the provision of a single service; rather, Qwest is challenging the 2010 Ordinance because of the breadth of the definition of "gross revenue." Thus, the appropriate measure for prohibitive effect is the overall impact of the 2010 Ordinance on Qwest, not its impact on a specific service.

Finally, the City focuses on factual distinctions between the instant matter and *Santa Fe II*. The City first contends that the 2010 Ordinance assesses a percentage of revenue for the occupancy and use of the public rights-of-way, unlike the 1998 Ordinance, which was based on an appraisal and lease system. (*See* Doc. 474 at 18). The Court recognizes this difference in the character of the two ordinances; however, it is of little relevance in determining whether the quadrupling of Qwest's costs is similarly prohibitive in its effect. Second, the City asserts that the 1998 Ordinance was deemed prohibitive not solely because of the quadrupled costs associated with Qwest's cabinets, but due to the "cumulative effect of the rental fees, appraisal, dedication and excess capacity requirements." (*Id.* at 19 (quoting *Santa Fe I*, 224 F. Supp. 2d at 1325)). While the district court's determination was premised on the cumulative effect of the 1998 Ordinance, the Tenth Circuit clearly held that the quadrupled costs Qwest would incur for the rental of cabinets alone had a prohibitive effect. *See Santa Fe II*, 380 F.3d at 1271. Third, the City argues that Qwest's cost increase will actually be less than it appears because Qwest may elect to pass these costs through to the customer. (*See* Doc. 474 at 19). The Court has found no precedent holding that, if a fee can legally be passed through by the company, it is not prohibitive. Furthermore, as discussed above, the Court finds it reasonable to infer that any increase to a customer's bill in a competitive market could exacerbate customer loss.

Finally, the City asserts that Qwest's cost increase under the 2010 Ordinance is not a significant one. In *Santa Fe II*, Qwest was facing an increase in costs from $500,000 under the 1975 Agreement to over $2 million for rent on Qwest's 365 roadside utility cabinets. 380 F.3d at 1271. Here, the City contends that the increase is less than $550,000, which is minimal considering Qwest's net profits. In distinguishing a $2 million fee increase from a $534,035 increase, the City relies on a 2008 decision by this Court. *Elephant Butte*, 616 F. Supp. 2d 1110. At issue in *Elephant Butte* was whether a fee schedule implemented by an irrigation district was preempted by Section 253 because it increased the fee for each linear foot of facilities installed parallel to the district's waterways from a penny to fifteen cents, more than quadrupling the per foot fee. *Id.* at 1121-22. The Court refused to find the fee schedule prohibitive on Qwest's motion for summary judgment because material facts remained, including facts that would establish Qwest's overall costs pursuant to the fee schedule and that would give context to the impact of the fee schedule. *Id.* at 1123-24. In so holding, the Court deemed it inappropriate to analyze the prohibitive effect of a per foot fee based on percentages alone given that the actual amount of the increase was just fourteen cents and the per foot fee was only one part of the entire fee schedule. *Id.* at 1123. Unlike in *Elephant Butte*, the Court here has made findings of fact that establish the total amount of the fee increase resulting from the 2010 Ordinance and provide the necessary context to determine the impact of that increase on Qwest. The 2010 Ordinance would have caused Qwest's 2012 operating costs in the City to increase by at least $534,035, and the total payment to the City in 2012 would be four times Qwest's actual 2012 payment. A more than half-million dollar increase is similar to the magnitude of the cost increase addressed by the Tenth Circuit in *Santa Fe II* but distinct from the fourteen cent increase at issue in *Elephant Butte*. Additionally, as in *Santa Fe II* but unlike *Elephant Butte*, it is undisputed that the 2010

36

Ordinance would quadruple Qwest's total operating costs in the City. Because the Tenth Circuit has found an increase of similar magnitude sufficient to demonstrate a prohibitive effect in the past, the magnitude of the cost increase resulting from the 2010 Ordinance suffices to establish the prohibitive effect here.

Additionally, the Court concludes that the definition of gross revenue contained within the 2010 Ordinance has a prohibitive effect to the extent it requires Qwest to allocate the revenue under the long distance call to the City scenario. Call paths vary based on customer location and capacity of Qwest's facilities, and city boundaries are largely irrelevant for call transmission. As acknowledged by the Supreme Court in *Goldberg v. Sweet*, 488 U.S. 252 (1989), it is effectively impossible to develop systems to track revenue from services billed on a per call basis for each call, determine the degree to which the call traveled over facilities in the relevant public rights-of-way, and then allocate the earned revenue accordingly. *Id.* at 264-65 ("An apportionment formula based on mileage or some other geographic division of individual telephone calls would produce insurmountable administrative and technological barriers.").[10] The City suggests that allocation is not required, apparently because Qwest could simply pay the fee based on the entire amount it charges the long distance carrier for the call. (*See* Doc. 474 at 32-33). However, paying the amount without allocating the costs from the use of the City's rights-of-way would be unfair and could result in Qwest paying multiple franchise fees on the revenue from the long distance carrier, should the areas surrounding the City implement a similar franchise fee scheme. Thus, the Court concludes that this requirement of the 2010 Ordinance is also effectively prohibitive.

To clarify, by finding the 2010 Ordinance effectively prohibitive, the Court does not hold that any franchise fee in today's world will be effectively prohibitive, as suggested by Qwest.

---

[10] The City asserts that *Goldberg* is inapplicable because the Supreme Court was not faced with a Telecommunications Act claim. However, the Court's recognition of the fact that an apportionment formula presents technologically insurmountable barriers is equally applicable to the case at hand.

(*See* Doc. 475 at 4). Nor does the Court's holding preclude the City from charging telecommunication service providers a non-prohibitive fee for their use of the public rights-of-way. (*See* Doc. 474 at 6 (arguing that allowing Qwest to use the public rights-of-way without charge would violate the Anti-Donation Clause of the New Mexico Constitution, N.M. CONST. art. 9, § 14)). The Court merely holds that the quadrupled franchise fee required under the 2010 Ordinance constitutes a massive increase that would effectively prohibit the provision of services and that the allocation required under at least one scenario based on the definition of "gross revenue" in the 2010 Ordinance is technologically impossible and therefore prohibitive.

### b. Fair and Reasonable Compensation

The state of New Mexico granted utilities the right to install infrastructure in the streets and public rights-of-way throughout the state and authorized local governments to regulate the use of the rights-of-way. N.M. STAT. ANN. §§ 3-49-1, 62-1-2; *City of Albuquerque v. N.M. Pub. Serv. Comm'n*, 79 P.3d 297, 300 (N.M. 2003). The state also delegated authority to counties and cities to enter into franchise agreements with utilities. *See* N.M. STAT. ANN. §§ 3-42-1(E), 62-1-3. The New Mexico Supreme Court has acknowledged that franchise fees are a common method by which cities receive compensation for right-of-way use. *City of Albuquerque v. N.M. Pub. Serv. Comm'n*, 854 P.2d 348, 357 (N.M. 1993).

Nevertheless, the authority granted by the state must be exercised in such a way that the compensation required from telecommunication service providers remains "fair and reasonable" and is imposed on a "competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c). These requirements are intended to prevent monopolistic pricing by municipalities. *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 79 (2d Cir. 2002).

The requirements of Section 253(c) have not been interpreted to limit municipalities to cost recovery. *Qwest Commc'ns, Inc. v. City of Berkeley*, 433 F.3d 1253, 1257 (9th Cir. 2006); *but see P.R. Tel Co.*, 450 F.3d at 22. When fees are not cost-based, though, the compensation scheme must be evaluated pursuant to the totality of the circumstances test set forth in *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 625 (6th Cir. 2000). *Santa Fe II*, 380 F.3d at 1272. Relevant factors under the totality of the circumstances test include: (1) the extent of the provider's use of the public rights-of-way; (2) whether the use will be exclusive; (3) the amount other providers would be willing to pay; (4) the impact on the provider's profitability; and (5) the fees to which the provider previously agreed. *Elephant Butte*, 616 F. Supp. 2d at 1119 (citing *Santa Fe II*, 380 F.3d at 1272-73; *TCG Detroit*, 206 F.3d at 625). The City bears the burden to demonstrate that the 2010 Ordinance falls within this exemption.

The Court concludes that the City failed to demonstrate that the fee provision of the 2010 Ordinance is "fair and reasonable" and "competitively neutral and nondiscriminatory." The manner by which the City arrived at the franchise fee shows that the fee was adopted as a general revenue measure. Ms. Brennan, the City official charged with crafting the 2010 Ordinance, determined that the City need not conduct a cost study, so she did not speak to anyone to determine the City's costs in managing its rights-of-way and did not estimate the revenue that would be generated by the 2010 Ordinance. Instead, she opted to set a fee based on a survey of the surrounding communities. She reviewed the percentage assessed pursuant to franchise agreements in several New Mexico municipalities, but she did not review the base on which those fees are assessed. Given her mistaken belief that the 1975 Agreement required Qwest to pay a fee based on gross revenue, she defined gross revenue as the base for the 2010 Ordinance. The 2010 Ordinance represents the only franchise fee in the state that would assess a fee on

Qwest's gross revenue, and it substantially expands the base from that established in the 1975 Agreement.

Given that the fee is wholly unrelated to the City's costs, the Court considers the totality of the circumstances. First, the Court finds that the City failed to establish that the contemplated fee is related to Qwest's use of the public rights-of-way. Qwest and Comcast are the only providers of voice services with facilities in the City's rights-of-way. Other telecommunication service providers would also be permitted to utilize the City's rights-of-way pursuant to a franchise agreement. In addition to Qwest and Comcast, the gas company, electric company, and water and wastewater utility have infrastructure in the public rights-of-way. Thus, Qwest's use of the rights-of-way is not exclusive. Though the Court finds that Qwest's network extends into many of the City's public rights-of-way, the evidence presented does not allow the Court to evaluate Qwest's use of the public rights-of-way as compared to the other users. To the limited extent that street cut permits reflect the extent of use, Qwest represents a little over ten percent of the annual permits. However, pursuant to the 2010 Ordinance, Qwest's payment would represent over twenty percent of the total franchise fees received by the City. The City certainly did not consider the extent and non-exclusive nature of Qwest's use of the rights-of-way prior to enacting the 2010 Ordinance, and the Court concludes that the 2010 Ordinance does not bear a relation to the extent or non-exclusive nature of Qwest's use.

The Court further finds that the City failed to prove that any other providers would be willing to pay a similar amount for the use of the public rights-of-way. Though the City claimed that it had received applications from two telecommunication service providers to operate within the City since passing the 2010 Ordinance, it did not adduce any evidence as to what services those providers offer, the projected amount of their payments, what the applications entailed, or

whether the providers agreed to the fee provisions of the 2010 Ordinance by submitting applications. Indeed, the only affirmative evidence regarding other providers' willingness to pay the fee set by the 2010 Ordinance proved that they would not be willing to pay such a fee. CityLink, one of the providers that originally inquired with the City regarding a franchise agreement and prompted the drafting of the 2010 Ordinance, expressed that it was unwilling to extend its network into the City because of the fee and other provisions contained within the 2010 Ordinance, and it has not sought to expand its network to the City even after the amendments to the 2010 Ordinance.

The impact of the fee on Qwest's profitability is one factor weighing in the City's favor. Though it is impossible to assess the impact of the fee under the 2010 Ordinance on Qwest's profitability from non-internet services within the City, it is undisputed that Qwest is quite profitable in New Mexico and would remain so despite the fee increase. Indeed, based on Qwest's overall profitability within New Mexico, it is difficult to fathom any fee arrangement that would substantially impact Qwest's profitability. *Compare with P.R. Tel Co.*, 450 F.3d at 19-20 (holding that an eighty-six percent commonwealth-wide reduction in profits would strain the telecommunication provider's ability to provide services).

The amount of the fee previously agreed to would also weigh in the City's favor but for the contextual shift that occurred between 1975 and today. Under the 1975 Agreement, signed when Qwest was a monopoly provider experiencing constant access line gain, Qwest paid as much as $625,069 in 2001, $68,634 less than Qwest would have been required to pay in 2012 under the 2010 Ordinance ($693,703). Though Qwest was no longer the monopoly provider in 2001, it still held the majority of the market share in the City for dial tone. Since that time, Qwest has experienced rapid loss of dial tone customers and its overall revenue from all services has

decreased by 7.5%. Thus, the context in which Qwest and the City are operating has changed substantially. Additionally, though the amount itself is similar, the base on which the fee is assessed is far more broad. No other jurisdiction includes wholesale services in its fee base, either in New Mexico or elsewhere. Qwest has never agreed to include wholesale revenue in a franchise fee base. Additionally, the base includes revenue that would have to be apportioned, specifically the revenue from the long-distance call to the City scenario. This sort of apportionment is effectively impossible, and Qwest has never agreed to a similar requirement.

Finally, the Court concludes that the City failed to establish that the franchise fee at issue does not discriminate among competing carriers. None of Qwest's competitors will be subject to the fee. Comcast is not currently required to pay a franchise fee for the provision of any other services aside from cable television. Because of its current franchise agreement and the possibility that VoIP does not qualify as a telecommunication service, the City has not established that Comcast will be required to pay franchise fees under the 2010 Ordinance. Additionally, wireless providers, CLECs, and nomadic VoIP providers do not maintain facilities within the City's public rights-of-way, so they will not be subject to the fee. Of course, as the City points out, it cannot charge providers that do not have facilities in the rights-of-way a franchise fee. However, this fact merely heightens the City's burden to establish that the fee assessed relates to at least some degree to the company's use of the public rights-of-way and/or the City's costs in managing the public rights-of-way.

Considering the totality of the circumstances, despite the fact that the fee provision of the 2010 Ordinance would not likely have a significant impact on Qwest's profitability, the Court finds that the fee provision and the definition of gross revenue within the 2010 Ordinance are neither fair and reasonable nor competitively neutral and nondiscriminatory. Therefore, the fee

provision and definition of gross revenue included in the 2010 Ordinance are not saved from preemption pursuant to 47 U.S.C. § 253(c).

### c. Severability

Because the Court has determined that the fee provision (Section 27-2.5(A)) and the definition of gross revenue (contained within Section 27-2.3) of the 2010 Ordinance are preempted by Section 253 of the Telecommunications Act, the Court must determine whether these provisions are severable from the remainder of the 2010 Ordinance. The 2010 Ordinance contains a severability clause: Section 27-2.17 of the 2010 Ordinance states that if any part or subpart of the ordinance is declared invalid, the invalidity will not affect the enforceability of the remainder of the ordinance.

Whether the preempted provisions of the ordinance are severable from the remainder of the ordinance is a matter of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In New Mexico, "[i]t is a fundamental principle that a part of a statute may be invalid and the remainder valid, where the invalid part can be separated from other portions, without impairing the force and effect of the remaining portions." *Giant Indus. Ariz., Inc. v. Taxation & Revenue Dep't*, 796 P.2d 1138, 1140 (N.M. Ct. App. 1990) (citing *Bradbury & Stamm Constr. Co. v. Bureau of Revenue*, 372 P.2d 808 (N.M. 1962)). A partially invalid statute must satisfy the following test before it can continue in force:

> (1) the invalid part must be separable from the other portions without impairing the force and effect of the remaining parts; (2) the legislative purpose expressed in the valid portion can be given force and effect without the invalid part; and (3) when considering the entire act, it cannot be said that the legislature would not have passed the remaining part if it had known that the objectionable part was invalid.

*Id.* "[T]he effect of a declaration of severability in the ordinance creates a presumption that the ordinance is divisible," *City of Albuquerque v. Cauwels & Davis Mgmt. Co.*, 632 P.2d 729, 731

(N.M. 1981), because such a declaration is presumed to show that the legislative body would "have passed the remaining part if it had known that the objectionable part was invalid," *Giant Indus. Ariz., Inc.*, 796 P.2d at 1140.

The Court concludes that Section 27-2.5(A), which contains the franchise fee provisions, is inextricably linked to the definition of "Gross Revenue" contained within Section 27-2.3 and the requirements in the remainder of Section 27-2.5 relating to the payment of fees and the City's right to audit to ensure full and proper payments. The force and effect of Section 27-2.5 is impaired without the fee provision. The Court concludes that the remainder of the 2010 Ordinance, however, including all other definitions contained within Section 27-2.3, is severable from the invalid sections. The invalid sections do not impact the force and effect of the other sections, all of the legislative purpose of the 2010 Ordinance can be served without the invalid sections with the exception of the purpose of obtaining compensation for the use of the public rights-of-way (*see* Section 27-2.1(B)(4)), and the Court cannot say that the City would not have passed the 2010 Ordinance had it known that the definition of "Gross Revenue" and Section 27-2.5(A) would be preempted.

As such, the Court concludes that Sections 27-2.3 (definition of "Gross Revenue") and Section 27-2.5 are severable from the remainder of the 2010 Ordinance, and the preemption of these sections shall not impact the enforceability of the remainder of the 2010 Ordinance.

## III.    Dormant Commerce Clause

The Commerce Clause of the United States Constitution provides, "The Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. Although phrased as an express grant of power to Congress to regulate interstate commerce, "the Clause has long been understood to have a 'negative' aspect that denies the States the power

unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). This "negative aspect" is called the dormant Commerce Clause.

This is not the first time that a telecommunication service provider has raised a dormant Commerce Clause challenge to a local regulation in conjunction with a challenge pursuant to Section 253 of the Telecommunications Act. *See Aventure Commc'ns Tech., LLC v. Iowa Utils. Bd.*, 734 F Supp. 2d 636, 647 (N.D. Iowa 2010); *Qwest Commc'ns Corp. v. City of Greensboro*, 440 F. Supp. 2d 480, 492-93 (M.D.N.C. 2006); *Qwest Commc'ns Corp v. City of N.Y.*, 387 F. Supp. 2d 191, 195 (E.D.N.Y. 2005); *BellSouth Telecomms., Inc. v. City of Mobile*, 171 F. Supp. 2d 1261, 1279-80 (S.D. Ala. 2001); *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 127 F. Supp. 2d 1348, 1356-57 (S.D. Fla. 1999) (reversed in part on other grounds). Such claims withstood motions to dismiss in prior cases. *City of Greensboro*, 440 F. Supp. 2d at 492-93; *City of N.Y.*, 387 F. Supp. 2d at 195. However, this Court has found no case in which a dormant Commerce Clause challenge to a local regulation by a telecommunication provider has proven successful. *See In re Cell Tower Litigation*, 807 F. Supp. 2d 928, 938-39 (S.D. Cal. 2011) (litigation under § 332 of the Telecommunication Act); *Aventure Commc'ns*, 734 F Supp. 2d at 661-662 (denying preliminary injunction for local regulation's alleged violation of dormant Commerce Clause); *City of Mobile*, 171 F. Supp. 2d at 1280; *Town of Palm Beach*, 127 F. Supp. 2d at 1356-57. Oftentimes, such challenges are ultimately denied because the court finds that the local regulation did not violate the Telecommunications Act. Because the Court here concludes that the fee provision of the 2010 Ordinance does violate Section 253, the Court will address the merits of Qwest's dormant Commerce Clause claim.

45

Here, Qwest does not claim that interstate discrimination is involved. As such, the dormant Commerce Clause challenge to the 2010 Ordinance must be evaluated pursuant to the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Tenth Circuit has identified four factors that the Court must scrutinize under the *Pike* balancing test to determine whether a Commerce Clause violation exists: (1) the nature of the putative local benefits advanced by the ordinance; (2) the burden the ordinance exacts on interstate commerce; (3) whether the ordinance is clearly excessive in relation to the local benefits; and (4) whether local interests can be promoted with a lesser impact on interstate commerce. *Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Rogers*, 27 F.3d 1499, 1512 (10th Cir. 1994) (citing *Pike*, 397 U.S. at 142).

With respect to the first factor, the local benefit of the franchise fee is to generate revenue. Revenue generation is a legitimate local motive, but the revenue purpose must not unduly burden interstate commerce. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

With respect to the second *Pike* factor, Qwest claims that the 2010 Ordinance burdens interstate commerce in three respects. First, Qwest contends that interstate commerce is burdened because it uses the public rights-of-way in the City to link into a national telecommunications network. (Doc. 475 at 75-76). Second, Qwest contends that because it is required by law to assess switched access charges for accessing the Qwest network, which its competitors need not assess, the 2010 Ordinance creates a tier of fees that would not be incurred by Qwest's competitors. (*Id.* at 76-77). Finally, Qwest argues that the 2010 Ordinance burdens interstate commerce by assessing a fee against revenue from federal universal support programs. (*Id.* at 77-78).

The Court finds that Qwest has failed to demonstrate a burden on interstate commerce in any of the alleged respects. Qwest's first argument, based on its role in the national telecommunications network, would mean that any ordinance or regulation that is preempted by the Telecommunications Act would unduly burden interstate commerce. This is belied by the fact that in the seventeen years since the passage of the Telecommunications Act, despite several court determinations that local regulations are preempted by the Act, no court has also deemed the regulation in violation of the dormant Commerce Clause. As to Qwest's second and third argument, though a fee would be assessed against switched access and federal universal support programs, there is no evidence in the record as to the extent of the charges against switched access service and federal universal support programs or the effect that such charges would have on interstate commerce. Qwest simply asks the Court to assume that any charges against these services or programs would burden interstate commerce, and that is an assumption the Court cannot reasonably make.

Even had Qwest demonstrated a burden on interstate commerce, Qwest has not established that any burden on interstate commerce is excessive relative to the local benefits. Qwest argues, in circular fashion, that the fact that the franchise fee violates Section 253 demonstrates that it is excessive relative to local benefit. (Plaintiff Qwest Corporation's Post-Hearing Response Brief, Doc. 481, at 30). As mentioned above, however, such logic would mean that every regulation preempted by the Telecommunications Act is also necessarily unconstitutional under the dormant Commerce Clause. Such a result would be inconsistent with precedent. Because Qwest has not established the extent to which interstate commerce would be impacted by the 2010 Ordinance, and because a local government has a substantial interest in

generating revenue, the Court cannot conclude that any burdens of the 2010 Ordinance outweigh its benefits.

Finally, even were the other factors satisfied, Qwest has not shown that there is an alternative means to promote the local interests at stake. Qwest asserts as a possible alternative that the City could adopt a tax applicable to all telecommunication service providers equally. However, the City likely does not have the authority to impose such taxes, and instead any such tax would have to be imposed by the state of New Mexico. Mr. Baca explained that he has advocated such a tax before the state legislature and drafted legislation related to this tax. Nevertheless, Mr. Baca testified that his efforts have not proven successful. Consequently, the Court cannot find that another means exists to generate revenue from the provision of telecommunication services within the City.

Based on the above consideration of the relevant *Pike* factors, the Court concludes that Qwest failed to establish that the 2010 Ordinance violates the dormant Commerce Clause.

### IV.    Conclusion

As explained above, the Court concludes that the fee provision of the 2010 Ordinance is preempted by Section 253 of the Telecommunications Act, as it is effectively prohibitive and does not fall within the local regulation exception. Thus, Qwest is entitled to judgment declaring Sections 27-2.3 (defining "Gross Revenue") and 27-2.5(A) of the 2010 Ordinance preempted by federal law. These provisions are severable from the remainder of the 2010 Ordinance with the exception of the rest of Section 27-2.5, so the 2010 Ordinance is not preempted in its entirety. Additionally, as the 2010 Ordinance does not violate the dormant Commerce Clause, the City is entitled to judgment on Qwest's dormant Commerce Clause claim.

**THEREFORE,**

**IT IS ORDERED** that Sections 27-2.3 (defining "Gross Revenue") and 27-2.5(A) of the City of Santa Fe's 2010 Ordinance are hereby declared to be preempted by Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253.

**IT IS FURTHER ORDERED** that the City of Santa Fe, its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with it who receive actual notice of the Order by personal service or otherwise are permanently enjoined from enforcing Sections 27-2.3 (defining "Gross Revenue") and 27-2.5 of the City of Santa Fe's 2010 Ordinance.

**IT IS FURTHER ORDERED** that the 2010 Ordinance is not unconstitutional under the dormant Commerce Clause of the United States Constitution and the City of Santa Fe is entitled to judgment on this claim.

The parties shall prepare a form of judgment as to this order and the jury determination, to be provided to the Court within ten (10) days of the entry of this order.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**